IN THE

# United States Court of Appeals

## FOR THE FIFTH CIRCUIT

◆━◆◆━◆

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

—v.—

JIM C. HODGE; ALLQUEST HOME MORTGAGE CORPORATION,
formerly known as Allied Home Mortgage Corporation;
AMERICUS MORTGAGE CORPORATION, formerly known as
Allied Home Mortgage Capital Corporation,

*Defendants-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION
CIVIL ACTION NO. 4:12-CV-2676

## BRIEF OF PLAINTIFF-APPELLEE

RYAN K. PATRICK
United States Attorney

JEAN-DAVID BARNEA
JEANNETTE A. VARGAS
JOSEPH N. CORDARO
BENJAMIN H. TORRANCE
Special Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
(212) 637-2679

*Attorneys for Appellee*

# Certificate of Interested Persons

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Appellants:** Jim C. Hodge; Allquest Home Mortgage, formerly known as Allied Home Mortgage Corporation; Americus Mortgage Corporation, formerly known as Allied Home Mortgage Capital Corporation

**Counsel for Appellants**

David M. Gunn
dgunn@beckredden.com
Robert David "B.D." Daniel
bdaniel@beckredden.com
BECK REDDEN LLP
1221 McKinney Street
Suite 4500
Houston, TX 77010
(713) 951-3700
(713) 951-3720 (Fax)

Laurin H. Mills
laurin.mills@leclairryan.com
LECLAIRRYAN, P.C.
2318 Mill Road, Suite 1100
Alexandria, VA 22314
(703) 647-5903
(703) 647-5953 (Fax)

David A. Warrington
david.warrington@kutakrock.com
KUTAK ROCK LLP
1625 Eye Street NW, Suite 800
Washington, DC 20006
(202) 828-2437
(202) 828-2488 (Fax)

**Appellee:** United States of America

**Counsel for Appellee**
RYAN K. PATRICK
United States Attorney
Southern District of Texas
By:    Jean-David Barnea
       jean-david.barnea@usdoj.gov
       Jeannette A. Vargas
       jeannette.vargas@usdoj.gov
       Joseph N. Cordaro
       joseph.cordaro@usdoj.gov
       Benjamin H. Torrance
       benjamin.torrance@usdoj.gov
Special Assistant U.S. Attorneys
86 Chambers Street, Third Floor
New York, NY 10007
(212) 637-2679/2678/2745/2703
(212) 637-2686 (Fax)

***Qui Tam* Relator:** Irene E. Mark, personal representative of the Estate of Peter M. Belli

**Counsel for *Qui Tam* Relator**

| | |
|---|---|
| Brian H. Mahany | Joseph C. Bird |
| brian@mahanylaw.com | advocatejcb@aol.com |
| Mahany Law | The Law Offices of Joseph C. Bird, Esq. |
| P.O. Box 511328 | 920 East Lincoln Street |
| Milwaukee, WI 53203 | Birmingham, MI 48009 |
| (414) 258-2375 | (248) 658-8515 |
| (414) 777-0776 (Fax) | (248) 646-2303 (Fax) |

                       *s/ Jean-David Barnea*
                       Jean-David Barnea
                       Special Assistant United States Attorney
                       Attorney for Appellee

**Statement Regarding Oral Argument**

Pursuant to Fifth Circuit Rule 28.2.3, plaintiff-appellee respectfully requests oral argument. Plaintiff-appellee believes that oral argument is warranted because of the complexity of the issues presented and the length of the trial record.

# Table of Contents

Certificate of Interested Persons ............................................................i

Statement Regarding Oral Argument ....................................................iii

Table of Contents ..............................................................................iv

Table of Authorities.........................................................................viii

JURISDICTIONAL STATEMENT .........................................................1

ISSUES PRESENTED .........................................................................2

INTRODUCTION...............................................................................4

STATEMENT OF THE CASE ................................................................5

   A. The Complaint.........................................................................5

   B. Pretrial Proceedings Regarding Loan Sampling ...........................6

   C. The Trial.................................................................................9

      1. The FHA Mortgage Insurance Program and the Allied
         Companies ......................................................................9

      2. The Allied Companies .............................................................11

      3. Quality Control......................................................................12

         a. FHA Quality Control Requirements ...................................12

         b. The Allied Companies' Quality Control Failures...............13

      4. Underwriting of FHA Loans ...................................................17

         a. The FHA Underwriting Guidelines....................................17

         b. Inadequate Underwriting of FHA Loans by Allied
           Corporation ........................................................................18

      5. Origination of FHA Loans.......................................................21

      a. FHA Rules Regarding Loan Origination ........................... 21

      b. Origination of FHA Loans by Unlicensed Branches of Allied Capital ................................................................ 22

  D. Damages ................................................................................. 29

  E. Jury Deliberations and Verdict ............................................. 29

  F. Post-Trial Proceedings ......................................................... 33

SUMMARY OF THE ARGUMENT ............................................. 34

ARGUMENT ............................................................................... 37

POINT I—Sufficient Evidence Supports the Jury's FCA Verdict ......... 37

  A. Standard of Review ............................................................... 37

  B. The Evidence Supported the Jury's Conclusion that Defendants Violated the False Claims Act ............................. 38

    1. The Trial Evidence Supported the Jury's Finding that the False Statements Regarding the Origination of FHA Loans from Unregistered Branches Were Material ............................. 39

      a. The Materiality Standard ....................................... 39

      b. Defendants' Violations of the Registered-Branch Rule Were Material to HUD .......................................... 41

      c. HUD Did Not Know About Defendants' Fraud .................... 46

      d. Defendants' Remaining Arguments Do Not Defeat Materiality .......................................................... 48

    2. The Evidence Supported the Jury's Finding that Allied Capital and Hodge Knowingly Lied to HUD About the Origination of FHA Loans from Unregistered Branches ............ 52

    3. The Evidence Supported the Jury's Finding that Allied Corporation's False Certifications Regarding Its Underwriting of FHA Loans Were Made with the Requisite Scienter ............. 56

4. The Evidence Supported the Jury's Finding that Allied Corporation's False Underwriting Certifications Were Material ...................................................................... 60

C. The Evidence Supported the Jury's Finding that Defendants' False Statements Were Both But-For and Proximate Causes of HUD's Losses ..................................................................... 62

1. Defendants Ignore Precedent that Specifically Addresses Proximate Causation in the Mortgage Context ......................... 62

2. The Evidence Amply Supported the Jury's Conclusion that Defendants Actually and Proximately Caused HUD's Losses ... 66

a. Allied Corporation's Reckless Underwriting Caused HUD's Losses ....................................................... 67

b. The Origination of Loans from Unregistered Allied Capital Branches Caused HUD's Losses .............................. 70

POINT II—The District Court's FIRREA Verdict Against Hodge Should Be Upheld .................................................. 73

A. Standard of Review ................................................... 73

B. Hodge Has Waived Any Challenge to the Jury Verdict Form .... 73

C. Hodge Has Waived Any Argument that Section 1006 Requires the Defendant to Personally Make the False Entry .................. 75

D. Hodge Has Waived Any Argument that Allied Capital's Annual Certifications Did Not Encompass Compliance with HUD's Quality Control Rules ....................................... 77

E. The District Court's Assessment of FIRREA Penalties Against Hodge Should Be Upheld ............................... 79

POINT III—The District Court Did Not Err in Admitting Expert Testimony Based on Loan Sampling ............................. 80

A. Standard of Review ................................................... 80

B. Defendants Waived Any Challenge to the Use of Statistical Sampling or the Sampling Methodology Employed .................... 81

POINT IV—The District Court Did Not Err in Excusing a Juror Who Refused to Deliberate and Threatened Other Jurors .................... 86

A. Standard of Review ....................................................... 86

B. The District Court Did Not Abuse Its Discretion in Excusing Juror #7 ................................................................... 87

CONCLUSION ..................................................................... 90

Certificate of Service ......................................................... 91

Certificate of Compliance ................................................... 92

Appendix .......................................................................... 93

# Table of Authorities

## *Cases*

*Abbott v. BP Exploration & Production, Inc.*,
  851 F.3d 384 (5th Cir. 2017)...............................................................44

*Alfred v. Caterpillar, Inc.*,
  262 F.3d 1083 (10th Cir. 2001).........................................................82

*Allied Home Mortgage Corp. v. Donovan*,
  Civ. No. H-11-3864, 2014 WL 3843561 (S.D. Tex. Aug. 5, 2014),
  *vacated as moot*, 618 F. App'x 781 (5th Cir. 2015)...........................11

*Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*,
  920 F. Supp. 2d 475 (S.D.N.Y. 2013)................................................84

*Bank of America Corp. v. City of Miami*,
  137 S. Ct. 1296 (2017).......................................................................63

*Carlson v. Bioremedi Therapeutic Systems Inc.*,
  822 F.3d 194 (5th Cir. 2016).......................................................82, 85

*In re Chevron U.S.A., Inc.*,
  109 F.3d 1016 (5th Cir. 1997)...........................................................84

*In re Countrywide Financial Corp. MBS Litig.*,
  984 F. Supp. 2d 1021 (C.D. Cal. 2013) .............................................84

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)...........................................................................80

*Flowers v. Southern Regional Physician Services, Inc.*,
  247 F.3d 229 (5th Cir. 2001)..............................................................38

*Heck v. Triche*,
  775 F.3d 265 (5th Cir. 2014)..............................................................76

*Jimenez v. Wood County*,
    660 F.3d 841 (5th Cir. 2011) ............................................ 76

*Mathis v. Exxon Corp.*,
    302 F.3d 448 (5th Cir. 2002) ............................................ 83

*McCaig v. Wells Fargo Bank (Texas), N.A.*,
    788 F.3d 463 (5th Cir. 2015) ..................................... 74, 76

*McCann v. Texas City Refining, Inc.*,
    984 F.2d 667 (5th Cir. 1993) ............................................ 38

*Miller v. Bucher Distributors*,
    89 F.3d 265 (5th Cir. 1996) ............................................ 49

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
    806 F.3d 835 (5th Cir. 2015) ............................................ 80

*Montano v. Orange County*,
    842 F.3d 865 (5th Cir. 2016) ..................................... 38, 58

*Neder v. United States*,
    527 U.S. 1 (1999) ............................................ 40

*OneBeacon Insurance Co. v. T. Wade Welch & Assoc.*,
    841 F.3d 669 (5th Cir. 2016) ............................................ 37

*Paroline v. United States*,
    134 S. Ct. 1710 (2014) ............................. 63, 66, 70, 72

*Roman v. Western Manufacturing, Inc.*,
    691 F.3d 686 (5th Cir. 2012) ............................................ 49

*SEC v. Kahlon*,
    873 F.3d 500 (5th Cir. 2017) ............................................ 73

*SEC v. Life Partners Holdings, Inc.*,
    854 F.3d 765 (5th Cir. 2017) ............................................ 37

*Smith v. Jenkins,*
    732 F.3d 51 (1st Cir. 2013) ...................................................... 83

*Streamline Production Systems, Inc. v. Streamline Manufacturing, Inc.,*
    851 F.3d 440 (5th Cir. 2017) .................................................. 37

*Tyson Foods, Inc. v. Bouaphakeo,*
    136 S. Ct. 1036 (2016) .......................................................... 84

*United States ex rel. Badr v. Triple Canopy, Inc.,*
    857 F.3d 174 (4th Cir. 2017) .................................... 45, 52, 55

*United States ex rel. Campie v. Gilead Sciences, Inc.,*
    862 F.3d 890 (9th Cir. 2017) .................................................. 56

*United States ex rel. Escobar v. Universal Health Services, Inc.,*
    842 F.3d 103 (1st Cir. 2016) .................................................. 48

*United States ex rel. Harman v. Trinity Industries Inc.,*
    872 F.3d 645 (5th Cir. 2017) ............................... 39, 40, 45, 47

*United States ex rel. Longhi v. Lithium Power Technologies, Inc.,*
    575 F.3d 458 (5th Cir. 2009) ............................................ 40, 52

*United States ex rel. Spay v. CVS Caremark Corp.,*
    875 F.3d 746 (3d Cir. 2017) .................................................. 47

*United States ex rel. Wall v. Vista Hospice Care,*
    No. 3:07-cv-0604, 2016 WL 3449833 (N.D. Tex. June 20, 2016) ......... 85

*United States ex rel. Wallace v. Flintco Inc.,*
    143 F.3d 955 (5th Cir. 1998) .................................................. 38

*United States v. 14.38 Acres of Land,*
    80 F.3d 1074 (5th Cir. 1996) .................................................. 58

*United States v. Aguilar,*
  242 F. App'x 239 (5th Cir. 2007)........................................87

*United States v. Atlas,*
  132 F. App'x 518 (5th Cir. 2005)........................................75

*United States v. Carson,*
  455 F.3d 336 (D.C. Cir. 2006) ..........................................88

*United States v. Ebron,*
  683 F.3d 105 (5th Cir. 2012)............................86, 87, 88, 89

*United States v. Edwards,*
  303 F.3d 606 (5th Cir. 2002)........................................87, 89

*United States v. Eghbal,*
  548 F.3d 1281 (9th Cir. 2008)...................................*passim*

*United States v. Fuchs,*
  467 F.3d 889 (5th Cir. 2006)............................................76

*United States v. Giles,*
  300 U.S. 41 (1937)........................................................77

*United States v. Hopkins,*
  916 F.2d 207 (5th Cir. 1990)............................................77

*United States v. John,*
  597 F.3d 263 (5th Cir. 2010)............................................83

*United States v. Lerma,*
  877 F.3d 628 (5th Cir. 2017)............................................76

*United States v. Luce,*
  873 F.3d 999 (7th Cir. 2017)............................44, 45, 50, 63

*United States v. Mann,*
  161 F.3d 840 (5th Cir. 1998)............................................76

*United States v. Miller,*
  645 F.2d 473 (5th Cir. Unit A 1981).................................. 63, 64, 65, 66

*United States v. Nnaji,*
  70 F. App'x 217 (5th Cir. 2003)........................................... 87

*United States v. Olano,*
  507 U.S. 725 (1993)............................................................ 81

*United States v. Patel,*
  485 F. App'x 702 (5th Cir. 2012).............................. 87, 88, 89

*United States v. Peterson,*
  538 F.3d 1064 (9th Cir. 2008).................................. 65, 66, 70

*United States v. Quicken Loans Inc.,*
  239 F. Supp. 3d 1014 (E.D. Mich. 2017)............................ 61

*United States v. Schnitzer,*
  145 F.3d 721 (5th Cir. 1998)............................................. 77

*United States v. Spicer,*
  57 F.3d 1152 (D.C. Cir. 1995) ................................... *passim*

*United States v. Virgen-Moreno,*
  265 F.3d 276 (5th Cir. 2001)............................................. 87

*United States v. Wells Fargo Bank, N.A.,*
  972 F. Supp. 2d 593 (S.D.N.Y. 2013).................................. 61

*United States v. Young,*
  872 F.3d 742 (5th Cir. 2017)............................................. 81

*Universal Health Services, Inc. v. United States ex rel. Escobar,*
  136 S. Ct. 1989 (2016)............................................... *passim*

Statutes, Regulations, and Rules

False Claims Act,
  31 U.S.C. § 3729(a)(1) .................................................... 62

  31 U.S.C. § 3729(a)(1)(A) ................................................ 6

  31 U.S.C. § 3729(a)(1)(B) ................................................ 6

  31 U.S.C. § 3729(b) ....................................................... 52

  31 U.S.C. § 3729(b)(4) ................................................... 40

  31 U.S.C. § 3730(a) ........................................................ 1

Financial Institutions Reform, Recovery, and Enforcement Act of 1989,
  12 U.S.C. § 1833a ........................................................... 3

  12 U.S.C. § 1833a(a) ....................................................... 5

  12 U.S.C. § 1833a(c)(1) .................................................... 5

18 U.S.C. § 1006 ........................................................ 5, 75

18 U.S.C. § 1014 ............................................................. 5

28 U.S.C. § 1291 ............................................................. 2

28 U.S.C. § 1331 ............................................................. 1

28 U.S.C. § 1345 ............................................................. 1

24 C.F.R. § 202.2 (1997) ................................................... 78

24 C.F.R. § 202.5(h) (1997) ......................................... 12, 77, 78

24 C.F.R. § 202.8(b) (1997) ................................................ 78

24 C.F.R. § 203.5 .......................................................... 58

Fed. R. Civ. P. 30(b)(6) ........................................................ 27

Fed. R. Civ. P. 47(c) ...................................................... 32, 86

Fed. R. Civ. P. 50(a) ........................................................ 38

Fed. R. Civ. P. 50(b) ........................................................ 38

Fed. R. Civ. P. 51(d)(2) ..................................................... 76

No. 17-20720

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee
v.

JIM C. HODGE; ALLQUEST HOME MORTGAGE CORPORATION,
formerly known as Allied Home Mortgage Corporation; AMERICUS
MORTGAGE CORPORATION, formerly known as Allied Home
Mortgage Capital Corporation,

Defendants-Appellants

_____

On Appeal from the United States District Court
For the Southern District of Texas
Houston Division, Civil Action No. 4:12-CV-2636

_____

BRIEF OF PLAINTIFF-APPELLEE

_____

## Jurisdictional Statement

The district court had jurisdiction under 31 U.S.C. § 3730(a),

28 U.S.C. §§ 1331 and 1345. (ROA.2126). After a jury trial, the district

court (George C. Hanks, Jr., J.) entered final judgment in favor of

plaintiff-appellee the United States of America (the "government") on September 29, 2017.  (ROA.11602-03).[1]  Defendants-appellants Allied Home Mortgage Corp., now known as Allquest Home Mortgage Corp. ("Allied Corporation"), Allied Home Mortgage Capital Corp., now known as Americus Mortgage Corp. ("Allied Capital," and together, the "Allied companies" or "Allied"), and Allied CEO Jim C. Hodge (hereinafter "defendants"), filed a timely notice of appeal on November 16, 2017. (ROA.11613-15).  Accordingly, this Court has jurisdiction under 28 U.S.C. § 1291.

## Issues Presented

1.   Whether there was sufficient evidence for the jury to find that Allied Capital and Hodge violated the False Claims Act, 31 U.S.C. § 3729 *et seq*. ("FCA"), by falsely stating that loans submitted for insurance by the U.S. Department of Housing and Urban Development's ("HUD") Federal Housing Administration ("FHA") were originated by branch offices that were authorized to originate FHA-insured loans.

---

[1] This brief cites the record on appeal as "ROA" and the Brief for Appellants as "Br."

2.     Whether there was sufficient evidence for the jury to find that Allied Corporation violated the FCA by falsely certifying to HUD that it had underwritten FHA loans according to agency guidelines.

3.     Whether there was sufficient evidence for the jury to find that defendants' violations of the FCA caused HUD to suffer damages.

4.     Whether there was sufficient evidence for the jury to find that Hodge violated the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, 12 U.S.C. § 1833a ("FIRREA"), when the Allied companies, at Hodge's direction, falsely certified to HUD that they were in compliance with agency rules regarding quality control, and provided fabricated quality control documents to HUD auditors.

5.     Whether the district court had a proper evidentiary basis to assess penalties against Hodge for his violations of FIRREA.

6.     Whether the district court abused its discretion in denying defendants' motions to exclude the government's expert witnesses.

7.     Whether the district court abused its discretion in dismissing a juror who refused to deliberate and threatened other jurors.

## Introduction

During a five-week jury trial, the United States presented overwhelming evidence that the defendants had repeatedly, and for more than a decade, perpetrated a fraud upon HUD in connection with FHA-insured mortgage loans. The evidence at trial consisted primarily of the testimony of defendants' current and former employees, who admitted that the companies—at Hodge's explicit direction—repeatedly and expressly lied to HUD to conceal their failure to comply with the rules and guidelines designed to protect homeowners and the FHA program. This evidence properly convinced a jury, and ultimately the district court, that the defendants had violated the FCA and FIRREA.

Defendants largely omit any mention of that evidence from their brief to this Court. Instead, they seek to undermine the jury's verdict by mischaracterizing the evidence, making spurious legal arguments, taking positions contrary to the positions they took before the district court, and raising new arguments for the first time on appeal. But defendants cannot satisfy the high standard that must be met to set aside the jury's verdict. There was ample evidence supporting every aspect of the jury verdict and judgment, and the district court acted

well within the bounds of its discretion in its conduct of the trial. The jury and the district court properly held the defendants accountable for their proven misconduct, and the judgment should be affirmed.

## Statement of the Case

### A. The Complaint

This *qui tam* action was originally filed by a relator in the District of Massachusetts, and was transferred to the Southern District of New York in 2011. (ROA.67-68). The government intervened in the action on November 1, 2011. (ROA.69-70). The case was transferred to the Southern District of Texas by order dated August 21, 2012. (ROA.609-10).

On October 24, 2013, the government filed the operative third amended complaint. (ROA.2119-89). As relevant here, the government alleged that: (1) the Allied companies and Hodge had violated FIRREA[2] by falsely certifying to HUD annually that the companies were in

---

[2] FIRREA provides for civil penalties against a defendant who violates certain predicate criminal statutes including, as relevant here, 18 U.S.C. § 1006, which prohibits making false entries in materials submitted to HUD auditors, and 18 U.S.C. § 1014, which prohibits making false statements relating to FHA loans. *See* 12 U.S.C. § 1833a(a), (c)(1).

compliance with FHA regulations concerning quality control; (2) the
Allied companies and Hodge had violated FIRREA by providing
fabricated quality control documents to a HUD auditor; (3) Allied
Corporation had violated sections 3729(a)(1)(A) and 3729(a)(1)(B) of the
FCA by falsely certifying to HUD that the loans it had underwritten
satisfy FHA underwriting standards; and (4) Allied Capital and Hodge
had violated section 3729(a)(1)(B) of the FCA by making false
statements in records submitted to HUD to conceal the fact that Allied
Capital was routinely originating FHA-insured mortgages from branch
offices that were not authorized to originate FHA loans.  (ROA.2169,
ROA.2171, ROA.2179-81, ROA.2183-87).

## B.  Pretrial Proceedings Regarding Loan Sampling

On October 29, 2014, the government moved to compel the
production of the loan files that were the subject of its underwriting
claim.  (ROA.3585-741).  Defendants opposed on the ground that
producing all such loan files would be excessively burdensome.
(ROA.3796-817).  In lieu of producing the full set of loan files,
defendants ultimately agreed to the use of a statistical sampling
methodology to identify a subset of loan files that would be produced to

the government for purposes of conducting a re-underwriting analysis. (ROA.11986-87 ("[I]n many of these types of cases, there has been a big fight over whether or not sampling is appropriate at all. And I'm here to say you're not going to get opposition from these Defendants . . . on the idea that the Government should be allowed to move forward with sampling."); *see also* ROA.3801, ROA.11934).

The district court ordered the parties to have their respective statistical experts meet and confer regarding an appropriate sampling methodology. (ROA.11935, ROA.11944, ROA.11997-98, ROA.3874). At a January 25, 2015, hearing, the government's expert, Dr. Kathy Ensor, proposed a methodology for selecting a random, geographically representative sample stratified by underwriting date and the type of underwriting (ROA.12051-53, ROA.12061-62). Defendants' expert testified that he had no dispute with Ensor's proposed sampling methodology. (ROA.12062-63). The parties and the experts reported that the only unresolved issue concerned the size of the loan sample. (ROA.12059-65).

The district court ordered the parties to make written submissions outlining any remaining areas of dispute, including any *Daubert*

challenges.  (ROA.12065-67).  The court informed the parties that it intended through this process to resolve all *Daubert* challenges to the sampling methodology at the outset of the case, and would not allow such challenges on the eve of trial.  (ROA.12067).

By letter dated January 28, 2015, defendants affirmed that their only objections related to sample size, and did not make any *Daubert* challenge to the sampling methodology.  (ROA.3858-59, ROA.3865-66). The district court overruled defendants' limited objection, holding that the sample size had already "been whittled down as small as reasonably possible."  (ROA.12074-75).  The court therefore ordered sampling to proceed using the methodology proposed by Ensor.  (ROA.12074-75).

Eighteen months later, defendants did what the district court had instructed them not to do: they raised an untimely *Daubert* challenge to Ensor's testimony after discovery had been completed using the agreed-upon random sample of loan files.  (ROA.30268-74).  Defendants claimed for the first time that Ensor's sampling methodology was unreliable because it did not control for the 2008-09 financial crisis. (ROA.30271-74).  They then went further—arguing that the testimony of Richard Payne, the government's re-underwriting expert, should also

be deemed inadmissible on the grounds that the use of statistical sampling and extrapolation was *per se* inappropriate in a case involving underwriting decisions.  (ROA.30279-81).  The district court denied these belated *Daubert* challenges.  (ROA.5456).

## C.  The Trial

The trial in this matter began on October 19, 2016.  (ROA.12592, ROA.12595).  A nine-member jury was seated.  (ROA.12640-842).  Twenty-seven witnesses testified live (including Hodge and Allied compliance chief Jeanne Stell Hammond ("Stell"))[3] and seven testified via video deposition over sixteen days between October 20 and November 17.  More than 1,300 exhibits were admitted.  (ROA.12597-604).  The evidence presented included the following.

### 1.  The FHA Mortgage Insurance Program and the Allied Companies

The FHA insurance program insures participating lenders against losses on mortgage loans to homebuyers, principally first-time buyers.  (ROA.12948).  If a loan defaults, HUD reimburses the lender for any loss it suffers as a result.  (ROA.12948, ROA.14882-83).  Lenders must

---

[3] Stell was initially also named as a defendant in this action, but settled before trial.  (ROA.4427-43, ROA.4445).

apply for and be approved by HUD to originate and underwrite FHA-insured mortgage loans. (ROA.12950, ROA.16882-83, ROA.27878-79).

Loan correspondents are entities that originate FHA loans by taking loan applications and gathering other information from borrowers. (ROA.13393-94, ROA.27879, ROA.27900-01). They submit the loan applications to be underwritten by lenders, the entities that actually make the loans. (ROA.12936-37, ROA.27899-901). Lenders underwrite the loans by evaluating the borrowers' assets, credit, and ability to repay the loan, as well as the value of the property being purchased. (ROA.12981-13012, ROA.27972-28251). They then submit the loans to HUD to be "endorsed" for FHA insurance. (ROA.12949-50). "Direct endorsement lenders" are authorized to determine that loans are eligible for FHA insurance on HUD's behalf by certifying that the loans meet FHA guidelines. (ROA.12950).

Each FHA loan file submitted to HUD for insurance endorsement must be accompanied by FHA Form 92900-A, which sets forth certain information regarding the origination and underwriting of the loan, and must be executed by both the loan correspondent and the lender. (ROA.12962-70; *see also* ROA.18624-25).

HUD periodically audits FHA program participants and their loan files. (ROA.17207-09, ROA.14036-38). When HUD discovers violations, it may seek indemnification from the lender for any losses relating to the relevant loans or impose administrative penalties ranging from monetary penalties to suspension or expulsion from the FHA program. (ROA.13034-36, ROA.17210-11, ROA.20293-301).

## 2. The Allied Companies

During the relevant period, Allied Capital was an FHA loan correspondent and Allied Corporation was a direct endorsement lender. (ROA.18624). Hodge was the majority owner, chief executive officer, and board chairman of both firms. (ROA.16881-82, ROA.18287-89). He made all final decisions on corporate strategy and direction. (ROA.15539, ROA.16882). In 2011, around the time the government intervened in this case, HUD revoked the companies' FHA licenses and debarred Hodge from the FHA program. (ROA.18273, ROA.18277, ROA.19216-21).[4]

---

[4] *See generally Allied Home Mortgage Corp. v. Donovan*, Civ. No. H-11-3864, 2014 WL 3843561 (S.D. Tex. Aug. 5, 2014) (upholding HUD's revocation and debarment decisions), *vacated as moot*, 618 F. App'x 781 (5th Cir. 2015).

## 3.  Quality Control

### a.  FHA Quality Control Requirements

HUD requires both loan correspondents and lenders to implement and maintain a quality control program that complies with HUD requirements in order to maintain their HUD-FHA approval. (ROA.13021-23, ROA.27898, ROA.27945).  Under HUD rules, FHA participants must perform timely quality control reviews, which essentially entail re-underwriting a certain portion of their loans within a specified timeframe.  (ROA.13023, ROA.13026-30, ROA.17008-11, ROA.26750-51, ROA.27951-54).  As part of these reviews, lenders must reverify borrowers' employment by contacting their employers, and reverify their assets by contacting their financial institutions. (ROA.13030, ROA.27953; *see also* ROA.13516-17).

Both loan correspondents and lenders must certify annually to HUD that, among other things, they "conform[ ] to all HUD-FHA regulations necessary to maintain [their] HUD-FHA approval." (ROA.13037-39, ROA.28859, ROA.27915).  The regulation that set forth the requirements for maintaining FHA approval explicitly listed quality control.  24 C.F.R. § 202.5(h) (1997); (*see also* ROA.13040-41, ROA.17222-25, ROA.17887-89).  HUD relies on these annual

certifications, as it is not able to audit each participant's compliance with all requirements every year.  (ROA.17226).

### b.    The Allied Companies' Quality Control Failures

The Allied companies were chronically noncompliant with HUD's quality control requirements between 2001 and 2011.  (ROA.15675). This was principally because the companies, which shared a quality control department (ROA.13506, ROA.16893), had insufficient and unqualified staff (ROA.13978, ROA.15675).  Hodge was the ultimate source of these problems, personally refusing to devote the necessary corporate resources to this function.  (ROA.13978-79, ROA.18463-66). Moreover, as explained below, the Allied companies, with Hodge's knowledge and at his direction, repeatedly lied and provided false information to HUD about their noncompliance with the rules governing this critical check on loan quality.

During the relevant period, the companies either did not perform quality control reviews at all (ROA.13959-60, ROA.13977-78, ROA.15679-83, ROA.25514-29), or performed them only sporadically and long after the deadlines imposed by FHA rules (ROA.13525-27, ROA.13538-44, ROA.13980-87, ROA.14286, ROA.25460-94).  When

quality control reviews were actually performed, they were frequently

incomplete and often far less detailed than the searching

reconsiderations they were supposed to be. (ROA.13955-58).

Hodge knew that the quality control department was understaffed

(ROA.14303-04, ROA.15695), but refused to hire more quality control

staff despite his knowledge of the companies' noncompliance

(ROA.15696-97). He ultimately agreed to hire employees in the U.S.

Virgin Islands, in order to secure certain tax benefits, even though he

was unable to hire any employees there who had any mortgage

experience. (ROA.13539, ROA.13966-71, ROA.15685-87, ROA.17018).

Ultimately, rather than fix his broken quality control department,

Hodge devised a scheme to create falsified documents to conceal the

companies' violations. Specifically, the employees in the quality control

department were instructed to stop performing audits or sending out

reverifications and to make false entries in the software that generated

the quality control reports to make it seem as if the necessary

reverifications and reviews had been completed. (ROA.13556-58,

ROA.14300-02, ROA.25495-505). A former quality control employee

named Renita Mathis testified that she knew that this practice was

"fraudulent." (ROA.13558). She therefore went to Hodge and asked

that he confirm to her personally that she should follow this

instruction—which he did. (ROA.13557-60, ROA.14285).[5] Later, Allied

management instructed untrained clerical employees to similarly enter

false information into the quality control software to make it appear as

if they had done quality control reviews and reverifications, when they

had not. (ROA.13557-61, ROA.13689-705, ROA.13834-40, ROA.13844-

50, ROA.14285, ROA.14788-90).

In 2009, HUD notified Allied Corporation it would soon be

conducting a review. (ROA.26234). HUD directed Allied Corporation to

submit its recent quality control reports. (ROA.26236, ROA.14102).

Many of the falsified reports were included in the documents provided

to the HUD auditor. (ROA.14324-25, ROA.14328-31, ROA.14050-51,

ROA.25963-26025). The auditor confirmed that, had these quality

---

[5] After Mathis gave this testimony at her pretrial deposition, Hodge called Allied's former counsel, Joe James. (ROA.13562-63, ROA.13653-54, ROA.13922-23, ROA.17035). A few minutes later, James called Mathis's husband and told him to try to convince Mathis to "say that she couldn't remember some of the questions that [the government] was asking." (ROA.13656, ROA.13662).

control violations been disclosed to her, they would have led to serious regulatory consequences. (ROA.14052-55, ROA.14103-11).

Throughout this period, Allied Capital and Allied Corporation each annually certified to HUD that the companies complied with the rules required to maintain HUD approval. (ROA.17059-60, ROA.26230, ROA.28351-58, ROA.28859). Hodge signed the report for Allied Capital for the fiscal year ending June 30, 2008, which covered part of the period when the company had stopped doing full quality control reviews or any reverifications. (ROA.17060-63, ROA.28356). Several other reports, for both Allied Corporation and Allied Capital, were signed by Stell on Hodge's instructions. (ROA.15708-13, ROA.28354-55, ROA.28357-58). Stell testified that she and Hodge both knew the certifications were false at the time she signed them. (ROA.15712). A HUD witness made clear that the agency would not permit a lender with inadequate quality control to participate in the program, and that a lender falsely certifying its compliance would be penalized and lose its approval to make FHA loans. (ROA.17230-40; ROA.24879-81).

### 4. Underwriting of FHA Loans

#### a. The FHA Underwriting Guidelines

HUD published underwriting guidelines that direct endorsement lenders must follow in evaluating whether to make FHA loans, which include rules regarding minimum down payments, debt-to-income ratios, and property appraisals. (ROA.12982-13011, ROA.14862-69, ROA.27973-28251).

Underwriting an FHA loan requires careful review and consideration of hundreds of pages of documents relating to the borrower and the property being purchased in order to ensure that loans are made only to borrowers who are able to repay them. (ROA.12936-37, ROA.12978-81, ROA.14858-60, ROA.14863-64, ROA.14871). When lenders make loans that deviate significantly from the FHA guidelines, such as by approving loans substantially above the maximum allowed debt-to-income or loan-to-value ratios, HUD considers these violations to be material violations of the rules as they pose an unacceptable level of risk to the FHA program. (ROA.17217-22, ROA.27949-50). Lenders that were found through HUD reviews to have violated these guidelines were required to indemnify HUD for its losses

on the affected loans and could be subject to civil penalties. (ROA.17211-12, ROA.17216, ROA.19342-55).

For each loan, the lender certifies on HUD Form 92900-A that the loan is eligible for FHA insurance under HUD's guidelines. (ROA.12969, ROA.12974-76, ROA.26782-85). HUD relies on the direct endorsement lender's certifications that a loan complies with FHA's rules and guidelines when determining whether a loan is eligible to be endorsed for insurance. (ROA.12979-80, ROA.27764, ROA.27790).

### b. Inadequate Underwriting of FHA Loans by Allied Corporation

As a HUD-approved direct endorsement lender, Allied Corporation underwrote and certified loans for FHA mortgage insurance (primarily loans originated by Allied Capital). (ROA.16882, ROA.16989). Allied Corporation was required to adhere to HUD's underwriting guidelines when certifying loans for FHA mortgage insurance. (ROA.16883-84, ROA.27979-80). Hodge acknowledged that these underwriting guidelines were designed to prevent losses to HUD. (ROA.16884-86, ROA.18440-41).

Allied Corporation, however, earned money on each loan it made by selling them at a premium to investors. (ROA.16884, ROA.17833-39).

18

And it did not bear the risk of default because the loans were FHA-insured. (ROA.17836-39). So it pressured its underwriting employees to approve loans as fast as possible, leading to poor credit decisions and the certification of ineligible loans for FHA insurance. (ROA.13723, ROA.13727-28, ROA.14349-50, ROA.14358-59, ROA.14516, ROA.15500).

Hodge and Allied management gave underwriters daily quotas that were nearly impossible to meet consistently, and that were far in excess of those used by other lenders. (ROA.13726, ROA.13826, ROA.14341, ROA.14347-49, ROA.14513, ROA.14516, ROA.15495-96, ROA.15500, ROA.15509, ROA.26293-95). Underwriters who did not meet Allied's extreme quotas were terminated or threatened with termination. (ROA.14523, ROA.14526-27, ROA.26286-87, ROA.26292). This pressure from Allied management led to high levels of turnover in underwriting staff, further affecting the quality of underwriting. (ROA.13726-27, ROA.14340-41, ROA.14529, ROA.26242-62). It also led to chronic understaffing, as the reputation of Allied's underwriting department dissuaded qualified candidates from applying for positions and drove away existing employees. (ROA.14345, ROA.14359-60).

Hodge and other Allied management frequently pressured underwriters to reverse adverse decisions regarding a loan's eligibility for FHA insurance. (ROA.14350-51). Underwriters were also instructed to approve loans for Hodge's friends or acquaintances, or loans that had been originated by the branch managed by Hodge's son. (ROA.13728-29, ROA.14534-38, ROA.26265-66, ROA.26336-37).

All of this led to default rates for Allied Corporation that were consistently significantly above those of its peers, including during the financial crisis in 2008-09. (ROA.18443-44, ROA.18447-48, ROA.20562-64, ROA.27656-714). Payne, the government's underwriting expert, examined a representative sample of FHA loans underwritten by Allied Corporation. Based on his analysis of that sample, 53.7% of the loans on which HUD had paid claims were found to be ineligible for FHA insurance under HUD's underwriting guidelines. (ROA.15223, ROA.14916-17, ROA.27528-655). The loans Payne determined to be ineligible typically had multiple violations of objective and explicit HUD requirements, including borrowers' significantly exceeding the debt-to-income ratio, making insufficient down payments, failing to substantiate their stated income, or having insufficient funds remaining

after closing; flawed property appraisals; and files missing crucial documentation or containing suspicious documents. (ROA.14923-52, ROA.27528-655).

### 5. Origination of FHA Loans

#### a. FHA Rules Regarding Loan Origination

As of January 1, 2007, HUD rules prohibited offices that were not registered with HUD from having any involvement in the origination of FHA loans. (ROA.12964-65, ROA.27872; *see also* ROA.15566-72, ROA.17179-80, ROA.17193, ROA.19305-17 (permitting limited exceptions before 2007)). This rule was instituted because it had been HUD's experience that serious compliance issues result when non-FHA-approved entities originate FHA loans. (ROA.13048, ROA.17180-82, ROA.28275-76).

HUD monitored lenders' default rates as part of its oversight of participating lenders. (ROA.12955, ROA.16285). It collected loan-level data from each registered branch, and compared the branch's default rate to that of other lenders' branches operating in the same geographic area. (ROA.12957, ROA.12964, ROA.16285-87). This enabled HUD to determine which lenders, and which specific branches of those lenders,

would be audited, with higher default rates indicating higher review priority. (ROA.12954-55). Furthermore, when a given branch's loans had particularly high default rates compared to its geographic peers, HUD instituted a "Credit Watch Termination," which revoked the affected branch's ability to originate FHA loans, as well as the lender's ability to register new branches in the area. (ROA.12957, ROA.15596, ROA.16287-90, ROA.16569-70, ROA.26975-90).

Each FHA loan that a lender submitted to HUD for insurance endorsement was accompanied by Form 92900-A, which required the loan correspondent to identify the originating (HUD-registered) branch by its unique registration number and address, and contained a certification that the information it contained was true to the best of the correspondent's knowledge. (ROA.12964-66, ROA.15550-54, ROA.26782-85). A loan that was not originated from a registered branch was ineligible for insurance. (ROA.13188-90).

### b. Origination of FHA Loans by Unlicensed Branches of Allied Capital

Allied Capital operated hundreds of offices around the country that originated FHA loans. (ROA.15540, ROA.15558, ROA.16910). When HUD clarified its registered-branch rule in 2007, Stell, the compliance

officer, sent several company-wide emails (after vetting them with Hodge), confirming the companies' understanding of this rule before it came into effect. (ROA.15583-84, ROA.15592-94, ROA.16511-13, ROA.19068-71, ROA.26873-74, ROA.26962-63). These emails emphasized that "[b]ranches that . . . do not have their own lender ID can no longer originate and/or process FHA loans." (ROA.15592, ROA.26962-63). Hodge acknowledged that he knew and understood this rule. (ROA.16913, ROA.16919).

Rather than comply with the rule, however, Hodge decided to allow unregistered Allied Capital branches to continue to originate FHA-insured loans. (ROA.15572, ROA.15585, ROA.16541-51, ROA.16682-92, ROA.16945-46). In written corporate policies he approved, Allied employees were instructed to enter the FHA identification numbers and addresses assigned to other, unrelated registered branches in the loan documentation submitted to HUD. (ROA.26888-89, ROA.26946-48, ROA.27494-97, ROA.28508-63, ROA.16201-02, ROA.16532-34, ROA.16537-50). The registered branches whose registration numbers were being used in this fashion were not involved in the origination of the FHA loans in question and often were often not aware that their

identification numbers were being misused in this way. (ROA.13716-19, ROA.15614-18, ROA.16525-27, ROA.26902-03, ROA.26959-60).[6] Furthermore, several branch managers testified that their signatures on these certifications on behalf of Allied Capital had been forged. (ROA.15130, ROA.15170, ROA.15186-87, ROA.15279-81, ROA.15323).

Allied Capital also had authorization from HUD to operate a "direct lending branch," which it called the National Referral Center ("NRC"); such an office was permitted to originate FHA loans nationwide, but only loans that came in through the lender's call center or website. (ROA.15589-90, ROA.15642-43, ROA.26913-17). Allied Capital's written policies explicitly required unregistered branches originating FHA loans to use the NRC's identification number and address, even though the NRC had not originated these loans and was not permitted to do so. (ROA.16541-51, ROA.16682-92, ROA.26687-89, ROA.26946-48).

---

[6] Defendants claim that registered branches were sometimes "married" to unregistered branches and worked on FHA loans together (Br. 16), but the evidence showed the contrary (ROA.15738-40, ROA.16126-27). In any event, the post-2007 HUD rule specified that unregistered branches could not play *any* role in originating FHA loans. (ROA.16608-09, ROA.26927).

Hodge made the final decision concerning which branches to register with HUD. (ROA.15585, ROA.15591). He decided not to register all of the branches that originated FHA loans because he wanted to minimize HUD's scrutiny of Allied Capital's branches and because he did not want to pay the branch registration fees. (ROA.15564, ROA.15580-81, ROA.15585-86). Moreover, certain branches were not registered with HUD because they had been deemed by Hodge or other Allied management not qualified to handle FHA loans; these branches were nevertheless permitted to continue originating FHA loans using other branches' identification numbers. (ROA.16552-56, ROA.16560-61, ROA.18423-24, ROA.25508-13, ROA.26877-79). The company recognized that when such branches were not registered, HUD would not be able to monitor their default rates. (ROA.16562-63).

Allied Capital had several Credit Watch Terminations for branches located in North Carolina. (ROA.15595-98, ROA.16311, ROA.16570, ROA.25420-22, ROA.26975-90). HUD repeatedly informed Allied Capital that, under FHA rules, Allied Capital could not register any new branches in North Carolina until it "reinstated" the terminated

branches by identifying the root causes for their high default rates and putting into place a plan to avoid the same issues going forward. (ROA.16291-94, ROA.16297-98, ROA.16331-37, ROA.16344-47, ROA.16354-55, ROA.16571-73, ROA.16590, ROA.16612-13, ROA.26949-50, ROA.26919-22, ROA.20710). This rule was designed to prevent loan correspondents from closing the terminated branch and reopening a new branch nearby without addressing the reasons for the termination. (ROA.16299).

Rather than reinstating its terminated branches, Allied Capital, with Hodge's knowledge and participation, issued written instructions to its unregistered North Carolina branches to continue originating FHA loans and falsely use the identification numbers of other registered branches (including the NRC) in its loan documentation to conceal this activity from HUD. (ROA.15650-53, ROA.16674, ROA.16678-92, ROA.26888-89; *see also* ROA.16963-64, ROA.26904-06 (Hodge personally authorizing an unregistered North Carolina branch to originate loans under another branch's ID); ROA.26881-85, ROA.16694-705, ROA.16944-45 (Hodge instructing Allied employee to

send a letter falsely claiming that unregistered North Carolina branch could originate FHA loans)).

On March 11, 2011, in the wake of a multistate audit that had identified just eight of the hundreds of loans that were originated from the unregistered branches in North Carolina, Allied Capital was directed by state authorities to report its violation to HUD. (ROA.15656-69, ROA.26890-91, ROA.28868-76). The company's letter, signed by Hodge, contained what Allied Capital's Federal Rule of Civil Procedure 30(b)(6) witness and Stell admitted at trial were several false statements:

- Hodge falsely represented that the eight loans were "inadvertently originated" from unregistered branches, and described their origination as "an inadvertent and isolated instance."

- Hodge falsely informed HUD that Allied Capital's "policy has always required strict adherence to FHA requirements regarding the origination of loans from approved branch offices."

- Hodge truthfully indicated that Allied Capital was "fully aware of the requirement that an FHA loan may not be originated from a non-FHA approved branch office" but then falsely stated that the company had "consistently adhered to this requirement and [was] confident that this error will not recur."

(ROA.26890-91, ROA.16722-29, ROA.15672-73; *see also* ROA.16971).

Hodge's letter did not report any other loans that Allied Capital had

originated from unregistered branches. (ROA.26890-91, ROA.15670).

In fact, Hodge told Stell that he did not want her to investigate the

full scope of the company's violation of this rule, as it would expose the

company to requests by HUD for indemnification. (ROA.15623-26).

HUD indeed requested voluntary indemnification for these eight loans

due to the "seriousness" of the violations, but Allied Capital refused to

comply. (ROA.13055-56, ROA.27406-16). Ultimately, in reliance on the

false statements in Hodge's letter that the noncompliance was

inadvertent and limited to eight loans, and because Allied Capital had

already ceased operating as an FHA loan correspondent at that time,

HUD decided not to pursue formal sanctions. (ROA.13279-80).

All together, Hodge admitted that there were at least 943 FHA-

insured loans (including 756 from North Carolina), totaling $123.3

million, that were originated from unregistered Allied Capital branches

between 2007 and 2010. (ROA.16179, ROA.16190-91, ROA.16199-200,

ROA.16216-18, ROA.25054-410, ROA.28507-63).

## D. Damages

A HUD witness testified regarding the HUD claim process generally, and the amounts paid out by HUD with respect to defaulted loans originated and underwritten by the Allied companies specifically. (ROA.16763-82, ROA.28362-90). The government's damages expert used this claims data to determine the amount of HUD's net losses with respect to the loans in the sample that Payne had determined were ineligible for FHA insurance. (ROA.17090). He then extrapolated the result to the entire population of loans that had gone into claim status. (ROA.17090-92, ROA.17746-55). He concluded that there were 1,196 ineligible loans on which HUD had suffered net losses of over $86 million. (ROA.17755, ROA.17759). He further testified that HUD's data reflected that HUD had paid claims with respect to 145 loans originated from unregistered branches, with net losses of over $10 million. (ROA.17073-74).

## E. Jury Deliberations and Verdict

The jury commenced deliberations on November 18, 2016. (ROA.18772). The jury was provided with a special verdict sheet, upon which it was asked to answer fourteen separate questions pertaining to

each defendant's liability and damages under the FCA and FIRREA. (ROA.8340-51). On the second day of deliberations, the district court informed the parties that it had received a note that revealed the substance of the deliberations. (ROA.18810). The court sealed the note and ordered the jury to follow its instructions. (ROA.18810).

On the following day of deliberations, the jury notified the district court that it could not reach a verdict. (ROA.18825). The court delivered the model civil *Allen* charge. (ROA.18826-30). Later that afternoon, the court informed the parties that it had received two further notes from the jury. (ROA.18831). The first stated that one juror "refuse[d] to talk to the group," showed "disdain for the law" and acted "like a rogue juror." (ROA.8322). The second stated: "[O]ne juror is starting to make threats to peoples' [*sic*] (fellow jurors') physical safety. Jurors are feeling insecure and threatened." (ROA.8323).

The district court decided to question the jury foreperson under oath. (ROA.18834-35). The foreperson testified that one juror had refused to deliberate and, when he had been asked to do so, said, "Hush or else." (ROA.18836-37). The foreperson further testified about concern in the jury room that the problem juror "would get violent."

(ROA.18837). In light of this testimony, the court determined that further inquiry was warranted. (ROA.18841). The court then published the jury note it had previously sealed. (ROA.18842). According to that note, one juror claimed to have "made up his mind," stating, "when the Government has it in for you, they will find a way to get you." (ROA.8318). The note also indicated that the juror was wearing earplugs in the jury room so as not to hear the deliberations. (ROA.8318).

The district court questioned all nine jurors separately under oath and cautioned them not to reveal the substance of their deliberations. (ROA.18851-83). Four jurors testified that not all the jurors were participating in the deliberations. (ROA.18869, ROA.18876-77, ROA.18880, ROA.18882). One juror stated that the earplug-wearing juror was "downright shouting" about not wishing to collaborate and had become "irate" when the other jurors asked him to review the evidence. (ROA.18865-66). Three other jurors testified that they interpreted statements made by the problem juror as threatening. (ROA.18853, ROA.18858, ROA.18870-71). Another referred to a "reaction of threat." (ROA.18881). A fifth testified that the juror who

wore earplugs "yell[ed]" to the point that she felt "shaky." (ROA18865-67). A sixth testified that the juror was acting "kind of scary," with a "scary" tone of voice. (ROA.18878).

Juror #7 denied making threats, but admitted to wearing earplugs in the jury room. (ROA.18874-75). When the district court asked Juror #7 if he would be willing to re-examine his views if a substantial majority of jurors disagreed with him, Juror #7 responded with a *non sequitur*: "Yes. My—my decision is reasonable. Yes." (ROA.18873). The court repeated the question; the juror reiterated, "I say yes, my decision is reasonable." (ROA.18873). The court then recalled the foreperson, who identified the juror referred to in the jury notes as Juror #7. (ROA.18882). The foreperson testified that Juror #7 was wearing fisherman's glasses that hid his eyes and slept in the jury room while the other jurors were deliberating. (ROA.18882-83).

The district court excused Juror #7 under Federal Rule of Civil Procedure 47(c). (ROA.18898-99). The court found credible evidence that this juror had failed to comply with his duty to deliberate and had threatened at least one other juror. (ROA.18899). The court also

determined that Juror #7's testimony was not credible, noting his body language and demeanor.  (ROA.18899).

The jury returned to its deliberations but did not return a verdict that day.  Instead, it was not until late the following afternoon that the district court reported to the parties that the jury had reached a verdict. (ROA.18930).  The jury found for the government on all claims. (ROA.18932-38, ROA.8340-51).  It concluded that Allied Capital and Hodge had caused HUD to suffer single damages of $7,370,132 on 103 loans with respect to the false statements concerning loan originations, and that Allied Corporation had caused HUD to suffer $85,612,643 in single damages on 1,192 loans from its reckless underwriting. (ROA.8340-51).

## F.  Post-Trial Proceedings

On September 14, 2017, the district court denied defendants' motions for a new trial and for judgment as a matter of law, and entered an order setting forth the damages and penalties for which they would be liable.  (ROA.11561-94).  The court awarded $23,140,396 in FCA treble damages and penalties jointly and severally against Allied Capital and Hodge; $268,757,929 in FCA treble damages and penalties

against Allied Corporation; and $2,200,000 in FIRREA penalties against each defendant. (ROA.11594). The court entered judgment in favor of the government on September 29, 2017. (ROA.11602-03).

## Summary of the Argument

As the district court correctly concluded, defendants are entitled neither to judgment as a matter of law nor to a new trial.

First, the jury was presented with more than sufficient evidence to support its verdict. Specifically, the jury heard evidence that Allied Capital's misstatements to HUD, directed by Hodge, about its origination of loans from unregistered branches were material to the agency because it would not have insured loans from such branches. *See infra* Point I.B.1. The evidence also showed that these misstatements were made with the requisite scienter, as Allied Capital and Hodge both knew that they were providing false information to HUD and appreciated the reasons it was important to the agency. *See infra* Point I.B.2. Similarly, the jury was presented with sufficient evidence of the materiality of Allied Corporation's misstatements to HUD about its compliance with FHA underwriting standards and of the

lender's scienter with respect to those misstatements. *See infra* Point I.B.3-4.

The jury also heard sufficient evidence to support its determination that defendants' false statements to HUD caused the agency to suffer FCA damages. The district court properly instructed the jury to find for the government only if it established that defendants proximately caused the agency's losses; the government was not required to prove that defendants' actions were the sole cause of HUD's losses. *See infra* Point I.C.1. There was ample evidence to support the jury's conclusion that defendants' fraud proximately caused HUD's FCA damages. *See infra* Point I.C.2.

Hodge's challenges to the FIRREA verdict fare no better. His arguments on appeal—challenges to the verdict form, to the scope of the predicate criminal statute underlying the FIRREA claim, and to the regulatory basis of the companies' annual certification to HUD—were not raised below and have thus been waived. They are also all without basis: the verdict form was not confusing as it corresponded neatly to the FIRREA claims as summarized in the government's closing argument; the predicate criminal statute has been repeatedly

interpreted by this Court consistent with the jury instructions, and the regulations underlying the annual certification do indeed support the government's claim. *See infra* Point II.B-D. Hodge's challenges to the district court's assessment of FIRREA penalties against him fail as well; the court considered Hodge's individual FIRREA liability along with the other defendants' and appropriately decided that each of them should pay statutory penalties. *See infra* Point II.E.

As for defendants' challenge to the district court's *Daubert* decisions about the loan sample used by the government's experts, this argument has been waived because defendants expressly agreed to the use of statistical sampling and the methodology employed. *See infra* Point III. Finally, the district court did not abuse its discretion in removing for cause a juror who threatened other jurors and refused to deliberate. *See infra* Point IV.

## ARGUMENT

## POINT I

## Sufficient Evidence Supports the Jury's FCA Verdict

## A. Standard of Review

Although this Court reviews a district court's ruling on a motion for judgment as a matter of law *de novo*, review of a jury's verdict is "especially deferential." *OneBeacon Insurance Co. v. T. Wade Welch & Assoc.*, 841 F.3d 669, 675 (5th Cir. 2016). This Court will reverse a denial of judgment as a matter of law if "the jury's factual findings are not supported by substantial evidence." *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 778 (5th Cir. 2017) (quotation marks omitted). This requires a showing that "facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Id.* at 777-78 (quotation marks omitted).

In reviewing a challenge to a jury verdict, this Court "draw[s] all reasonable inferences and resolve[s] all credibility determinations in the light most favorable to the verdict." *Streamline Production Systems, Inc. v. Streamline Manufacturing, Inc.*, 851 F.3d 440, 450 (5th Cir. 2017) (quotation marks, citation, and alterations omitted). It is the province of the jury alone to weigh conflicting evidence and

inferences.  *Montano v. Orange County*, 842 F.3d 865, 874 (5th Cir. 2016).

Yet even this deferential standard of review applies only where an issue has been properly raised and preserved in the district court.  *Id.* at 873.  If a party fails to raise an issue in its motions under Federal Rule of Civil Procedure 50(a) and 50(b), it waives "its right to challenge the sufficiency of the evidence on that issue on appeal."  *Flowers v. Southern Regional Physician Services, Inc.*, 247 F.3d 229, 238 (5th Cir. 2001).  As to waived arguments, review in this Court is for plain error only.  *McCann v. Texas City Refining, Inc.*, 984 F.2d 667, 673 (5th Cir. 1993).  Under this standard, this Court reviews only to determine whether there is "*any* evidence to support the jury verdict."  *United States ex rel. Wallace v. Flintco Inc.*, 143 F.3d 955, 963 (5th Cir. 1998) (quotation marks omitted).

## B.  The Evidence Supported the Jury's Conclusion that Defendants Violated the False Claims Act

As the district court correctly concluded, there was ample evidence to support the jury's FCA verdict.  Defendants' arguments to the contrary repeatedly misstate what was shown at trial and ignore the evidence against them.

A successful claim under the FCA requires proof of four elements: (1) a false statement, (2) made with the requisite scienter, (3) that was material, and (4) that involved a claim. *United States ex rel. Harman v. Trinity Industries Inc.*, 872 F.3d 645, 653-54 (5th Cir. 2017). Tellingly, defendants do not challenge the first or fourth elements, effectively conceding, as they must, that the relevant statements they submitted to HUD were false. There was more than sufficient evidence to sustain the jury's verdict with respect to the materiality and scienter elements of the government's two FCA claims as well.[7]

### 1. The Trial Evidence Supported the Jury's Finding that the False Statements Regarding the Origination of FHA Loans from Unregistered Branches Were Material

### a. The Materiality Standard

In *Universal Health Services, Inc. v. United States ex rel. Escobar*, the Supreme Court held that the " 'term material means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.' " 136 S. Ct. 1989, 2002 (2016) (quoting

---

[7] Defendants argue that the jury must have "compromise[d]" when it found that Allied Capital had made 103 false statements regarding branch origination. (Br. 31). Yet 103 loans was precisely the number that the government's damages expert identified if the jury found for the government on both FCA claims. (ROA.17759-60, ROA.17764).

31 U.S.C. § 3729(b)(4) (quotation marks omitted), and citing *Neder v. United States*, 527 U.S. 1, 16 (1999)).  Materiality can be determined through an objective test, measuring whether a "reasonable man would attach importance" to the false statement in making a determination, or through proof that "the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter in determining his choice of action." *Id.* at 2002-03 (quotation marks omitted).

*Escobar* thus "approved" the materiality standard previously adopted by this Court—that "the FCA requires proof only that the defendant's false statements 'could have' influenced the government's pay decision or had the 'potential' to influence the government's decision, not that the false statements actually did so." *Trinity Industries*, 872 F.3d at 661 (quoting *United States ex rel. Longhi v. Lithium Power Technologies, Inc.*, 575 F.3d 458, 469 (5th Cir. 2009) (quotation marks omitted)).  This inquiry requires an examination of " 'the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.' " *Id.* (quoting *Escobar*, 136 S. Ct. at 2002) (emphasis omitted).  The Court noted that a variety of factors are

relevant to the materiality inquiry and stressed that no single factor is automatically dispositive. *Escobar*, 136 S. Ct. at 2001. These include whether the agency expressly designated the relevant requirement as a condition of payment, whether the agency took action when it had actual knowledge of similar violations, and whether the violation is significant or goes to the "essence of the bargain." *Id.* at 2003-04.

### b. Defendants' Violations of the Registered-Branch Rule Were Material to HUD

The jury heard sufficient evidence of the importance of the registered-branch rule to HUD's supervisory scheme, and how false statements to conceal noncompliance would have affected decisions to insure loans, to satisfy this standard. HUD required all branches originating FHA loans to obtain the necessary regulatory approval so they would thereby be subject to the stringent rules regarding the operation of registered branches, and so that HUD could monitor their activities. (ROA.17180-82 (HUD witness describing the controls that exist with respect to registered branches, and explaining that "we want these controls for the borrower and for HUD")). Moreover, HUD used the registration numbers of originating branches (listed in Box 13 on Form 92900-A) to track which branches' loans defaulted at rates that

were significantly higher than average, in order to subject those branches to additional scrutiny or potential regulatory action. (ROA.12954-57, ROA.12964, ROA.16285-90).

The registered-branch rule was instituted because it had been the agency's unsurprising experience that "the instances of serious compliance problems increase as do the associated risks" when unapproved entities originate FHA loans, including increased risks to borrowers. (ROA.28275-76, ROA.13048, ROA.13186-87, ROA.17180-82). Thus, far from being technical rules designed for mere data-gathering (*contra* Br. 35-37), HUD's rules prohibiting loan origination by unapproved branches and requiring lenders to identify the originating branch ensured that branches offering FHA loans were known to the agency and subject to its regulatory control.

False statements designed to conceal the fact that Allied Capital originated loans from unregistered branches were therefore important to HUD, and specifically had more than just the "potential" to influence its decision to insure loans. HUD witnesses testified that, if the agency knew that an FHA loan had been originated from an unregistered branch, it would not have insured the loan. (ROA.13188-90). Form

92900-A affirmatively states that the lender's certification, which includes the affirmation that all the information contained on that form—including the identification number for the originating branch in Box 13—is "true to the best of the lender's knowledge," is made to "induce" HUD to "issue a firm commitment for mortgage insurance." (ROA.26782; *see also* ROA.12968 (HUD witness explaining that this certification includes the identification of the originating branch)).

Moreover, when HUD eventually learned of a handful of loans that Allied Capital had originated from unregistered branches in North Carolina, the agency immediately sought indemnification "due to the seriousness of the violation." (ROA.27406). HUD witnesses further testified that, had they learned that Allied Capital had deliberately originated loans from unregistered branches, they would have referred the company for administrative sanctions. (ROA.13279-81, ROA.17206). Finally, when HUD learned of the allegations in this litigation regarding unregistered branch origination, it promptly acted to suspend the Allied companies and debar Hodge from further participation in the FHA program. (ROA.18273, ROA.18277, ROA.19216-21).

This overwhelming evidence of materiality is thus a far cry from the cases upon which defendants rely. (Br. 38-39). In each of those cases, courts held that relators could not demonstrate materiality when, after learning of and fully investigating the defendant's misstatements, the government took no action against the defendant and instead continued making payments. *See, e.g.*, *Abbott v. BP Exploration & Production, Inc.*, 851 F.3d 384, 388 (5th Cir. 2017) (finding no materiality "when the [agency] decided to allow the Atlantis to continue drilling after a substantial investigation into Plaintiffs' allegations").

In contrast, courts of appeals after *Escobar* have held that evidence similar to the proof presented to the jury in this case was more than sufficient to demonstrate materiality in FCA cases. For example, in *United States v. Luce*, 873 F.3d 999, 1007-08 (7th Cir. 2017), the Seventh Circuit affirmed the grant of summary judgment to the government where a lender falsely certified to HUD in his annual certification that he had no criminal history. Evidence that truthful certifications were eligibility requirements for program participation, and that HUD had instituted debarment proceedings once it learned of

the conviction was deemed sufficient as a matter of law to establish materiality. *Id.*

Similarly, the Fourth Circuit held that a defense contractor made a materially false statement when it billed for security guards who had not passed a required marksmanship test. *United States ex rel. Badr v. Triple Canopy, Inc.*, 857 F.3d 174, 178-79 (4th Cir. 2017). In explaining that the violations were material, the Fourth Circuit noted, among other things, that the government did not renew the contract once it learned of the misrepresentation. *See id.* at 179. The court also concluded that a reasonable person would consider the provision of "guards that cannot shoot straight" to be material. *Id.*

### c. HUD Did Not Know About Defendants' Fraud

Defendants' assertion that HUD continued to insure FHA loans with full knowledge of Allied Capital's scheme (Br. 38-40) is baseless. Courts may consider the paying agency's actions as one factor in *Escobar*'s multifactor materiality analysis only when the agency was made aware of all relevant facts and nonetheless made a decision to authorize payment. *Trinity Industries*, 872 F.3d at 663 ("[T]hough not dispositive, continued payment by the federal government *after it learns*

45

*of the alleged fraud* substantially increases the burden on the relator in establishing materiality" (emphasis added)).  HUD had no such knowledge at the time it insured the loans in question because Hodge took affirmative steps to hide the misconduct from it for years. (ROA.13051-54, ROA.26890-91).

Defendants' "government knowledge" argument rests entirely on a strained reading of a single sentence from an email exchange between Allied Capital and a HUD employee named Belinda Martin.  (Br. 37). Yet nothing in this email exchange put the government on notice that Allied Capital was originating FHA loans from unregistered branches. (ROA.26918-43).  In this exchange, Martin was asked about the process of restoring terminated branches in North Carolina; she responded by directing the company to the relevant rules and reiterating that already-registered branches could continue originating FHA loans despite the termination.  (ROA.26919).  At trial, Martin made clear that her email did not relate to unregistered branches, and that she was not

made aware of Allied Capital's practice of unregistered branch origination.  (ROA.16339-40, 16342-43).[8]

For these reasons, defendants' reliance on *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746 (3d Cir. 2017), is misplaced. In *Spay*, it was uncontested that the agency was aware that pharmacies had entered "dummy" physician identification codes where the underlying information was not available, and nonetheless approved reimbursement.  *Id.* at 764-65.  There was no comparable agency knowledge in this case.  This Court's recent decision in *Trinity Industries*, also cited by defendants (Br. 35, 38), is an even more extreme example of government knowledge and approval.  In that case, after the defendant's allegations were disclosed to and vetted by the

---

[8] Indeed, the evidence demonstrated that defendants never actually believed that Martin, unsolicited and in response to an unrelated question, authorized Allied Capital to originate loans from unregistered branches in contravention of HUD rules.  Defendants' implausible reading was never confirmed with Martin or anyone else at HUD. (ROA.15661, ROA.16123, ROA.16339-43, ROA.16621-35, ROA.16655-58, ROA.26919).  Nor did the company ever cite this supposed authorization in its dealings with HUD when the eight loans that violated this rule were uncovered in the state audit.  (ROA.13498-99, ROA.16731, ROA.26890-91).  And Allied Capital's violations in North Carolina long predated the receipt of this email.  (ROA.16216, ROA.16671-74, ROA.26656-57, ROA.28507, ROA.29968).

agency, the government pronounced that there had been "an unbroken chain of eligibility for Federal-aid reimbursement" for the highway guardrails at issue.  872 F.3d at 650.

In contrast, the facts here are more akin to the First Circuit's decision following remand from the Supreme Court in *Escobar*, which held that the undisclosed regulatory violation at issue—the provision of treatment by unlicensed mental-health providers—was material to a state Medicaid program.  *United States ex rel. Escobar v. Universal Health Services, Inc.*, 842 F.3d 103, 111 (1st Cir. 2016).  The court ruled that the agency's "mere awareness of *allegations* concerning noncompliance" did not defeat materiality, as the relevant factor was whether the agency "had *actual knowledge* of the violations at the time it paid the claims at issue."  *Id.* at 112 (emphasis added).

### d. Defendants' Remaining Arguments Do Not Defeat Materiality

Defendants' remaining arguments fare no better.  They inaccurately contend that the government's claims premised on violations of HUD's registered-branch rule were asserted under the "implied certification" theory of FCA liability.  (Br. 35 (discussing whether the rule is a "condition of payment")); *see Escobar*, 136 S. Ct. at

2001. But the government did not pursue an implied certification theory in this case, as that basis for liability, which applies when a defendant has failed to disclose noncompliance with a material requirement, is unnecessary when (as here) a defendant makes affirmative misrepresentations. *See Escobar*, 136 S. Ct. at 1999.

Defendants also point to evidence that they argue tends to undercut the materiality of their violations. But the mere existence of conflicting evidence is not enough to overturn a jury verdict. *Miller v. Bucher Distributors*, 89 F.3d 265, 268 (5th Cir. 1996). For example, defendants assert that because HUD's rules regarding registered branches went through changes over time, the rule in effect in the relevant period, 2007 through 2010, could not have been material to the agency's decision to insure FHA loans. (Br. 14, 36-37). But the jury weighed this evidence, and found it less persuasive than the substantial evidence of materiality proffered by the government. *See Roman v. Western Manufacturing, Inc.*, 691 F.3d 686, 692 (5th Cir. 2012) (province of the jury to weigh conflicting evidence).

Indeed, if anything, this evidence served to emphasize the importance of the registered branch rule. Even before 2007, HUD

required FHA loans to be originated from registered branches, although it allowed the satellite offices of registered branches to take loan applications. (ROA.15566-72, ROA.17179-80, ROA.17193, ROA.19305-17). That HUD eliminated the use of satellite offices because of its negative experience with the involvement of unregistered offices in FHA loan origination (ROA.28275-76), is further evidence of the importance the agency attached to the registered branch requirement.

And in 2010, HUD engaged in a wholesale reorganization of the FHA program, in which independent loan correspondents had to come under the control of registered lenders and a national registry of lenders and loan professionals was created that allowed HUD to supervise FHA program participants more closely than it could previously. (ROA.17194-204, ROA.28275-76, ROA.23143-48, ROA.24888-906). As the Seventh Circuit recently explained, the regulatory change in 2010 "in no way suggests that the actions of loan correspondents are not material; if anything, it demonstrates that their actions are of sufficient import that further supervision by an intermediary is required." *Luce*, 873 F.3d at 1009.

Finally, defendants imply that the perceived unfairness of HUD's rules denying them the ability to register new branches in North Carolina until they administratively "reinstated" several branches that had been previously terminated by the agency, served as a justification for flouting those rules. (Br. 14, 36-37). But lying and deception are not appropriate responses to an adverse agency decision. Again, this argument merely serves to reinforce the materiality of the false statements.

HUD prohibited loan correspondents from opening new branches in regions subject to a Credit Watch Termination to prevent them from doing exactly what Allied Capital did—voluntarily shutting down a "problem" office without correcting the underlying compliance issues, and then reopening an office nearby. (ROA.16291-94, ROA.16299, ROA.20710).[9] HUD had determined that Allied Capital should not originate FHA loans from new branch offices in North Carolina until

---

[9] Although defendants claim that resolving the Credit Watch Termination was impossible because the offices had been closed years earlier (Br. 15, 36-37), "reinstatement" does not entail actually reopening a shuttered branch, but instead requires reviewing the loan files from that office to determine the causes of the high default rate and instituting measures to correct them (ROA.16571-73, ROA.16577-79, ROA.20710).

the terminated branches' deficiencies had been fully investigated and addressed. (ROA.16297-98, ROA.16331-32, ROA.16344, ROA.26918-43). Rather than appeal that decision, as the company was given the opportunity to do (ROA.15609-10, ROA.26949-51), Hodge and Allied Capital circumvented the rule and lied about it, *see Triple Canopy*, 857 F.3d at 178 (finding defendant's misrepresentations material due to its "own actions in covering up the noncompliance"). The jury was not required to credit defendants' implausible arguments that their deliberate misstatements did not have a "natural tendency to influence" HUD's decision to insure those loans, when that is precisely the reason they made those statements in the first place.

## 2. The Evidence Supported the Jury's Finding that Allied Capital and Hodge Knowingly Lied to HUD About the Origination of FHA Loans from Unregistered Branches

Defendants act with the requisite scienter under the FCA if they "had (1) actual knowledge of falsity, (2) acted with deliberate ignorance of the truth or falsity of the information provided, or (3) acted with reckless disregard of the truth or falsity of the information provided." *Longhi*, 575 F.3d at 468 (citing 31 U.S.C. § 3729(b)). "[P]roof of specific intent to defraud is not necessary." *Id.* (quotation marks omitted).

Allied Capital and Hodge do not dispute that they knew their statements to HUD identifying the originating branches for various loans were false. Nor could they.

The company and Hodge were undisputedly aware of the rule prohibiting the origination of loans from unregistered branches. (ROA.15583-84, ROA.15592-94, ROA.16511-13, ROA.19068-71, ROA.26873-74, ROA.26962-63). Hodge personally directed that certain branches originating FHA loans not be registered precisely in order to avoid HUD scrutiny. (ROA.15564, ROA.15580-81, ROA.15585-86). And the company's submission of false information about FHA loans originated by unregistered Allied branches was done knowingly, with direct input from Hodge, and pursuant to clear corporate policies. (ROA.15572, ROA.15585, ROA.16541-51, ROA.16682-92, ROA.16945-46, ROA.26888-89, ROA.26946-48). Moreover, when the deception was discovered, it is undisputed that Hodge lied to HUD by claiming that an inadvertent small-scale lapse, rather than deliberate widespread company policy, led to the violation. (ROA.26890-91, ROA.15672-73, ROA.16722-26, ROA.16971).

Rather than disputing their knowledge of falsity, Allied Capital and Hodge instead dispute the sufficiency of the evidence that they knew their misrepresentations were material. (Br. 33). This challenge is meritless. As *Escobar* explained, this requirement is ordinarily satisfied by the same evidence demonstrating the materiality of a requirement: if a reasonable person would understand that a condition is material to the agency, then the defendant's "failure to appreciate the materiality of that condition would amount to 'deliberate ignorance' or 'reckless disregard.'" 136 S. Ct. at 2001-02. As discussed in the previous section, a reasonable person would have understood that the origination of FHA loans from unregistered branches had the potential to influence HUD's decision to endorse the loans for FHA insurance. Thus, at a minimum, defendants acted in reckless disregard of this self-evident fact.

But defendants also had direct knowledge of the significance of this rule to the agency. They knew that HUD had adjusted its rules specifically to require that only registered branches originate FHA loans. (ROA.15583-84, ROA.15592-94, ROA.16511-13, ROA.19068-71, ROA.26873-74, ROA.26962-63). They further knew that the agency

tracked default rates branch by branch (ROA.15595-96), and decided

not to register branches to avoid HUD scrutiny (ROA.15564,

ROA.15580-81, ROA.15585-86).

Finally, the elaborate steps Allied Capital took, with Hodge's

knowledge and approval, to affirmatively hide from HUD the

origination of loans from unregistered branches are themselves

evidence of defendants' knowledge that the branch rule was important

to the agency. Allied Capital's corporate policies instructed

unregistered branches to submit hundreds of false loan certifications to

HUD listing the addresses and identification numbers of registered

branches that did not originate the loans in question. (ROA.15572,

ROA.15585, ROA.16541-51, ROA.16682-92, ROA.16945-46, ROA.26888-

89, ROA.26946-48). And later, when Hodge was required by a state

audit to disclose the violations of the relevant rules with respect to eight

loans, he lied to HUD, saying that the violations were inadvertent and

isolated. (ROA.26946-48, ROA.15672-73, ROA.16722-26, ROA.16971).

As courts have recognized, a defendant's conduct to cover up a

violation of the law is circumstantial evidence of both scienter and

materiality. *See, e.g.*, *Triple Canopy*, 857 F.3d at 178 (materiality);

*United States ex rel. Campie v. Gilead Sciences, Inc.*, 862 F.3d 890, 904

(9th Cir. 2017) (allegations that defendant "established practices to

deceive the government, and repeatedly took actions to hide its fraud"

satisfy scienter requirement), *petition for cert. filed* (U.S. Jan. 3, 2018).

There would be no reason for Hodge and Allied Capital to take such

measures to provide false information to HUD had they believed the

agency did not care about loans originated by unregistered branches.

3. **The Evidence Supported the Jury's Finding that Allied Corporation's False Certifications Regarding Its Underwriting of FHA Loans Were Made with the Requisite Scienter**

Substantial evidence supports the jury's verdict that Allied

Corporation acted with reckless disregard or deliberate ignorance as to

the falsity of its certifications that it underwrote loans according to

FHA guidelines.  There is no question that Allied underwriters were

familiar with FHA underwriting guidelines and understood how to

apply them.  (ROA.14346, ROA.14510-11, ROA.15493-94).  Yet the

government's underwriting expert nonetheless determined that over

half of the loans that defaulted had serious and objectively obvious

underwriting defects.  (ROA.14916-17, ROA.15223, ROA.27528-655).

The evidence at trial demonstrated precisely why these underwriting defects occurred. Allied Corporation earned money by making FHA loans and selling them at a premium to investors; the greater the volume of loans, the greater its profits. (ROA.17833-39). And because these loans were FHA-insured, and Allied Corporation did not bear the risk of default (ROA.17836-39), the quality of these loans was unimportant to the company. Allied management therefore applied inordinate pressure to the underwriters to approve questionable loans and to review loans more quickly than was possible with proper diligence, putting profit above compliance. *See supra* at 19-20. And the company's deliberate failure, at Hodge's direction, to conduct adequate quality control reviews further evidenced defendants' reckless disregard of its compliance with FHA underwriting guidelines. *See supra* at 13-16. One of the primary reasons that quality control is a key component of the FHA program is that it enables lenders to identify any systemic issues in their underwriting. (ROA.13021, ROA.27945). The jury was entitled to infer from this evidence, including the evidence regarding how pervasive and obvious the underwriting violations were, that Allied

Corporation was at least reckless or deliberately ignorant of the truthfulness of its certifications.

Defendants' arguments to the contrary focus on the methodology used by the government's underwriting expert. Yet these criticisms merely go to the weight to be given to this evidence. *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996). It was the province of the jury to determine whether and to what extent to credit Payne's testimony. *Montano*, 842 F.3d at 873.

In any event, as the jury itself concluded, defendants' attacks on Payne's methodology are without merit. The record nowhere contains an admission from Payne "that he consciously refused to apply the HUD standard," and instead applied a standard that "was entirely developed for litigation." (Br. 68; *accord* Br. 48). To the contrary, Payne explained at length that he applied HUD's underwriting guidelines for FHA loans, as set forth in HUD regulations, handbooks, and mortgagee letters. (ROA.14589-90, ROA.14915, ROA.14998). Defendants' contention that Payne "admitted he never followed the 'golden rule' of underwriting" set forth in 24 C.F.R. § 203.5 is similarly specious. (Br. 47). Payne explicitly testified that he applied all FHA standards, including

section 203.5, when performing his re-underwriting analysis.

(ROA.14885-87). It is thus decidedly not true that the standards Payne

used "could not have been known to Allied Corporation employees." (Br.

48). Indeed, several Allied underwriters testified to the contrary.

(ROA.14510-11, ROA.15493-94).[10]

Defendants' next suggestion, that because loan underwriting can

sometimes contain a subjective element it is impossible for a loan to run

afoul of underwriting guidelines or for a lender to be reckless as to its

compliance certifications, contradicts both the FHA guidelines

themselves and the testimony of Allied's own underwriters.

(ROA.17212-14, ROA.14346, ROA.14510-11, ROA.15493-94). Most of

HUD's underwriting guidelines provide clear, explicit rules that can be

objectively applied, such as the calculations of debt-to-income ratio, or

the verifications of assets and employment. (ROA.17212-15). When

Payne evaluated which Allied loans were ineligible for insurance, he

limited his analysis to whether the loan files reflected clear violations of

---

[10] Defendants also mischaracterize Payne's conclusions, arguing
that he "offered no proof that any particular underwriting decision
violated . . . HUD regulations." (Br. 48). Payne indeed testified about
specific violations of FHA rules in particular loans. (ROA.14923-52,
ROA.27528-655).

such explicit and objective FHA underwriting rules.  (ROA.27528-655; ROA.14987, ROA.15004-07).  That Allied Corporation certified that these loans were eligible for FHA insurance, when it would have been abundantly clear that they were not, is sufficient to support the jury's conclusion that Allied Corporation acted in reckless disregard of the truth.

Finally, defendants argue that the government cannot prove scienter in cases using statistical sampling in cases involving "subjective determinations."  (Br. 48-49).  But as discussed *infra* in Point III.B, this argument is both waived and meritless.

### 4. The Evidence Supported the Jury's Finding that Allied Corporation's False Underwriting Certifications Were Material

Defendants devote only two sentences of their brief to arguing that violations of FHA underwriting guidelines were immaterial to the agency because Allied Corporation, like all other lenders, was subject to agency audits.  (Br. 49).  This argument is spurious.  Audits are necessarily limited, and are not a substitute for the compliance and integrity of participants in the Direct Endorsement Lender program.  (ROA.14039-42, ROA.14052-54, ROA.14103-05).  HUD audits did not

relieve Allied Corporation of its responsibility for verifying and certifying to HUD that loans are made to creditworthy borrowers and conform to FHA underwriting guidelines. (ROA.12979-80, ROA.16883-84, ROA.27979-80). That is the "essence of the bargain" of a lender's participation in the FHA program (ROA.27764, ROA.27790); nothing could be more material to an agency that insures mortgage loans than the quality of the loans it insures. *E.g.*, *United States v. Quicken Loans Inc.*, 239 F. Supp. 3d 1014, 1039-40 (E.D. Mich. 2017); *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 619 (S.D.N.Y. 2013).

That HUD is not able to discover all underwriting violations through its limited audit capacity (ROA.14039-42, ROA.14052-54, ROA.14103-05), does not mean that such violations are immaterial to the agency. When HUD discovered underwriting violations, including at Allied Corporation, it could and did seek indemnification for the loans in question or impose penalties on the lender (ROA.13034-36, ROA.17210-12, ROA.17216, ROA.19342-43, ROA.20293-301), underscoring the materiality of such violations.

## C. The Evidence Supported the Jury's Finding that Defendants' False Statements Were Both But-For and Proximate Causes of HUD's Losses

Defendants next attack the evidence showing that their misstatements caused damages to HUD, specifically claiming that the government made no effort to prove losses proximately caused by any FCA violation. (Br. 25). Yet the district court fashioned a jury charge that required the jury to find both but-for and proximate causation. (ROA.8336, ROA.18572).[11] The jury found that the government had met its burden of proof on this issue, and the evidence amply supports the jury's conclusion.

### 1. Defendants Ignore Precedent that Specifically Addresses Proximate Causation in the Mortgage Context

To obtain FCA damages, the government must prove that it suffered losses "because of the act of" defendants. 31 U.S.C.

---

[11] Specifically, the district court instructed the jury that: "the United States must show by a preponderance of the evidence that the defendants' conduct was a substantial factor in causing the United States to suffer damages, and that the amount of damages suffered by the United States was a foreseeable consequence of the allegedly false statements, false claims, or fraudulent course of conduct." (ROA.18633).

§ 3729(a)(1).[12]  Courts have interpreted the FCA's causation requirement in light of common-law principles.  *See Escobar*, 136 S. Ct. at 1999; *Luce*, 873 F.3d at 1012.  At common law, proximate causation was a "flexible concept" that "generally refer[red] to the basic requirement that . . . there must be some direct relation between the injury asserted and the injurious conduct alleged."  *Paroline v. United States*, 134 S. Ct. 1710, 1719 (2014) (quotation marks omitted).  The requirement "is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct," *id.*, although it is not "based on foreseeability alone," *Bank of America Corp. v. City of Miami*, 137 S. Ct. 1296, 1306 (2017) (quotation marks omitted).  At bottom, the "requirement of proximate cause . . . serves . . . to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity."  *Paroline*, 134 S. Ct. at 1719.

Accordingly, this Court has held that "[i]n the context of a federal housing case, the United States must show that the false statements in

---

[12] The United States need not prove causation of damages to obtain statutory penalties under the FCA.  *See United States v. Miller*, 645 F.2d 473, 476 n.4 (5th Cir. Unit A 1981).

the [mortgage] application were the cause of subsequent defaults."

*United States v. Miller*, 645 F.2d 473, 476 (5th Cir. Unit A 1981). In

*Miller*, the requisite causation was found where the false statements

concerned "the ability of purchasers to afford housing," because such

statements "could very well be the major factor for subsequent

defaults." *Id.*

Other circuits have relied on *Miller* in holding that "false

statements regarding the credit worthiness of purchasers to afford

housing establish the required causal connection." *United States v.*

*Eghbal*, 548 F.3d 1281, 1284 (9th Cir. 2008) (citing *Miller*, 645 F.2d at

475); *accord United States v. Spicer*, 57 F.3d 1152, 1159 (D.C. Cir. 1995)

(citing *Miller*, 645 F.2d at 473). In *Spicer*, the D.C. Circuit concluded

that a real estate broker's "misrepresentations proximately caused

HUD's losses," where he had "overstated the down payment made by

the buyer" of a home, and that "misrepresentation was germane to

HUD's determination that the buyer qualified for an FHA-insured

mortgage." *Id.* at 1154, 1159.

Much like defendants here, the broker in *Spicer* argued that the

defaults that resulted in HUD's losses "were proximately caused by a

variety of factors, such as job loss or other personal financial reversals, all beyond [his] control." *Id.* at 1157. But the D.C. Circuit rejected this argument: "It is undoubtedly true that in each case other factors also 'caused' the buyer's default, but that is of no moment, for as long as [his] misrepresentations were a material and proximate cause, they need not have been the sole factor causing HUD's losses." *Id.* at 1159.

In *Eghbal*, the defendants "provided the down payment for the buyers by depositing their own personal funds into escrow via cashiers' checks," and then falsely "certified [to HUD] that they had not, and would not, pay the buyer[s] for any part of the down payment." 548 F.3d at 1282. The Ninth Circuit held that the standard for showing both but-for and proximate causation had been met, as the "false statements at issue here bore directly upon the likelihood that the buyers would be unable to make their mortgage payments, and thus . . . had a causal connection to the subsequent defaults sufficient to support FCA liability." *Id.* at 1284; *accord United States v. Peterson*, 538 F.3d 1064, 1077 (9th Cir. 2008).

Defendants argue that *Miller* "establish[ed] a specific causation rule '[i]n the context of a federal housing case'" (Br. 44), but they

misstate the content of that rule.  Under *Miller*, *Spicer*, and *Eghbal*, the government can prove proximate causation by showing that the "false statements at issue . . . bore directly upon the likelihood that the buyers would be unable to make their mortgage payments."  *Eghbal*, 548 F.3d at 1284.  Misrepresentations about a buyer's likely inability to repay bear a direct relation to that buyer's subsequent failure to repay. *Spicer*, 57 F.3d at 1159; *see also Paroline*, 134 S. Ct. at 1719.  As the Ninth Circuit has explained, when "unqualified buyers . . . obtain loans" and "subsequently default[ ]," the "very concern targeted" by HUD's rules governing eligibility is "exactly what eventuate[s]."  *Peterson*, 538 F.3d at 1077.  Moreover, loan defaults fall well within the "scope of the risk" created by misstatements about borrowers' creditworthiness. *Paroline*, 134 S. Ct. at 1719; *Spicer*, 57 F.3d at 1159; *Miller*, 645 F.2d at 475.

## 2. The Evidence Amply Supported the Jury's Conclusion that Defendants Actually and Proximately Caused HUD's Losses

The evidence fully supported the jury's determination that HUD's losses were both actually and proximately caused by defendants' false

statements concerning their underwriting and origination of loans from unregistered branches.

### a. Allied Corporation's Reckless Underwriting Caused HUD's Losses

First, the evidence supports the jury's conclusion that Allied Corporation's ten years of reckless noncompliance with HUD's underwriting requirements caused the agency's losses. (ROA.8344). With respect to but-for causation, the evidence showed that, had HUD known that Allied Corporation did not comply with its underwriting requirements, it would not have insured the loans Allied endorsed for insurance, and thus would have sustained no losses when those mortgages defaulted. (ROA.12973-74, ROA.12991, ROA.12998-99, ROA.13002, ROA.13007-11, ROA.13017-18, ROA.17211-19). Such proof amply supported the jury's determination that HUD would not have suffered losses in the absence of Allied Corporation's false statements. *See Eghbal*, 548 F.3d at 1284; *Spicer*, 57 F.3d at 1159.

The evidence also supports the jury's determination that Allied Corporation's misstatements proximately caused the HUD's losses. Agency witnesses explained why misstatements about issues such as a borrower's credit history or capacity to repay, the source of the funds for

a down payment, or indications that the borrower may have engaged in fraud all "bore directly upon the likelihood that the buyers would be unable" or unwilling "to make their mortgage payments," *Eghbal*, 548 F.3d at 1284, and confirmed that these types of misstatements increase the risk of mortgage default. (ROA.12973-74, ROA.12991, ROA.12998-99, ROA.13002, ROA.13007-11, ROA.13017-18, ROA.17211-19). The government's underwriting expert found that many of the loans underwritten by Allied Corporation contained the very types of misstatements that HUD witnesses had explained would increase the likelihood of default. (ROA.14861-68, ROA.14907, ROA.14916, ROA.14923-52). Finally, the evidence showed that, for much of the relevant period, the percentage of Allied Corporation's FHA-insured mortgages that defaulted significantly exceeded—and sometimes doubled—the national average. (ROA.10435-36, ROA.12957, ROA.18443-44, ROA.18447-48, ROA.20562-64, ROA.27656-714).

Thus, the government presented proof that Allied Corporation's applications for FHA mortgage insurance contained misstatements about borrower creditworthiness and that those misstatements

increased the risk of default.[13]  Such proof amply supports the jury's

conclusion that Allied Corporation's misstatements proximately caused

HUD's losses; indeed, it mirrors the evidence that the D.C. and Ninth

Circuits both held sufficient to support a grant of summary judgment in

the government's favor.  *See Eghbal*, 548 F.3d at 1284; *Spicer*, 57 F.3d

at 1159.

Defendants argue, as they did to the jury, that the government's

"experts unintentionally proved that the Government could *not* prove

causation" because, in their view, the margins of error for the claim and

nonclaim loans made the default rates "statistically identical."  (Br. 70-

71 (emphasis in original)).  Defendants do not cite any part of the record

in support of this argument, and for good reason: it is simply wrong.

When defendants attempted to elicit evidence of their theory by cross-

examining the government's expert statistician, she testified: "thinking

of the margin of errors in that fashion is incorrect," "that's not a

---

[13] Defendants' unsupported assertion that loans defaulted "due in
large part to the nationwide financial crisis" of 2008-09 (Br. 3), is belied
by the fact that Allied Corporation's mortgages defaulted significantly
more often than the national average even in that period (ROA.18443-
44, ROA.18447-48, ROA.20562-64, ROA.27656-714).  Because the
financial crisis affected all lenders, it could not have caused Allied
Corporation's mortgages to default at a higher rate than other lenders'.

statistically valid way to . . . think about this information," and "you are not using the idea of correlation in the right statistical manner." (ROA.15450, ROA.15454). No other evidence supports defendants' uninformed statistical conjecture.

Contrary to defendants' arguments (Br. 43, 50-51), the government was not required to prove that no other factor contributed to the default of each loan at issue. It will rarely be the case that loan defaults can be directly traced to specific misrepresentations; too many intervening causes and factors usually contribute to such defaults. Such a standard would be impossible to meet, and would preclude the government from ever bringing an FCA action for fraudulent underwriting. Nor do principles of proximate causation require such a heightened showing. *See Eghbal*, 548 F.3d at 1284; *Peterson*, 538 F.3d at 1077; *Spicer*, 57 F.3d at 1159; *see also Paroline*, 134 S. Ct. at 1719 ("Every event has many causes . . . some of [which] are proximate."). Here, the defaults on Allied Corporation's loans were reasonably foreseeable given the company's underwriting failures and the purpose of the FHA underwriting rules.

### b. The Origination of Loans from Unregistered Allied Capital Branches Caused HUD's Losses

Similarly, the evidence supported the jury's determination that Allied Capital's origination of mortgages from unregistered branches, at Hodge's direction, caused HUD's losses. (ROA.8342). With respect to but-for causation, agency witnesses testified that, during the relevant period, loans from unregistered branches were not eligible for FHA insurance. (ROA.12964-68, ROA.17179-80). In the absence of Allied Capital's misrepresentations regarding the originating branches, HUD would not have insured those mortgages and thus would not have suffered any losses due to the subsequent defaults. (ROA.12964-68, ROA.17179-80). This easily establishes but-for causation. *See Eghbal*, 548 F.3d at 1284; *Spicer*, 57 F.3d at 1159.

The evidence also supported the jury's conclusion that the government had proved proximate causation. When HUD announced that it would accept only mortgages originated by registered branches, it explained that "when non FHA-approved entities perform origination functions and services on FHA-insured loans, the instances of serious compliance problems increase[,] as do the associated risks," including the risk of default. (ROA.12964-68, ROA.17179-80, ROA.28275-76; *see*

*also* ROA.17180-82 (HUD controls on registered branches designed to protect both "the borrower and . . . HUD")). Moreover, the majority of the loans originated from unregistered branches were from Allied Capital branches in North Carolina, where HUD had prohibited Allied Capital from registering new branches in light of its termination of prior branches due to high default rates. (ROA.16306-07, ROA.16320). Finally, large percentages of the loans originated by individual unregistered branches defaulted and resulted in insurance claims to HUD. (ROA.16210-11 (21 claims for 88 loans, a rate of 24%), ROA.16212 (14 claims for 56 loans, a rate of 25%), ROA.16213 (11 claims for 24 loans, a rate of 46%)).

The evidence thus showed that HUD believed that loans from unregistered branches presented an unacceptable risk of default, that HUD prohibited Allied Capital from registering new branches in North Carolina because of a history of high default rates, and that the loans Allied Capital fraudulently submitted from unregistered branches defaulted at high rates. This evidence permitted the jury to reasonably conclude that Allied Capital and Hodge's misrepresentations about the origination of loans from unregistered branches bore a "direct relation"

to subsequent defaults and that those defaults fell within the "scope of the risk" created by their misstatements. *Paroline*, 134 S. Ct. at 1719; *Eghbal*, 548 F.3d at 1284; *Spicer*, 57 F.3d at 1159.

Accordingly, the FCA judgment should be affirmed.

## POINT II

### The District Court's FIRREA Verdict Against Hodge Should Be Upheld

On appeal, Hodge raises a number of challenges to the FIRREA verdict against him that he failed to preserve below. Moreover, in addition to being waived, each of these arguments fails on the merits. Accordingly, the FIRREA verdict, and the district court's imposition of statutory penalties for the violations found by the jury, should be sustained.

## A. Standard of Review

As stated above, challenges to a jury verdict are reviewed for sufficiency of the evidence supporting the verdict when the arguments were preserved in the district court, and for plain error when they were not. *See supra* Point I.A. The district court's penalty determinations are reviewed for abuse of discretion. *SEC v. Kahlon*, 873 F.3d 500, 504 (5th Cir. 2017).

## B. Hodge Has Waived Any Challenge to the Jury Verdict Form

At the charging conference (ROA.18570), Hodge's counsel stated that he had no objection to any of the jury questions that Hodge now claims are "impenetrable." (Br. 51-52, 58-59). Having failed to raise this concern with the district court, Hodge has waived any argument that the verdict form is ambiguous. *McCaig v. Wells Fargo Bank (Texas), N.A.*, 788 F.3d 463, 476 (5th Cir. 2015).

In any event, there is no ambiguity in the verdict form. Questions 11 and 12 plainly pertained to the companies' annual certifications of compliance with FHA rules, as reflected the title of the questions (ROA.8347-48 ("False Annual Certifications")), and the only evidence and arguments presented to the jury regarding certifications of compliance with quality control requirements concerned these certifications (ROA.18682-83, ROA.18691-93). Similarly, it was clear in the context of the trial that Questions 13 and 14 pertained to the falsified quality control documentation submitted to HUD during the agency audit. (ROA.8349-50). These falsified records were the subject of extensive testimony, and this was the only theory of liability that the government presented on these counts in its closing argument.

(ROA.18682-83, ROA.18691-93). Accordingly, there is no reasonable possibility that the jury was confused by these questions. *See United States v. Atlas*, 132 F. App'x 518, 519 (5th Cir. 2005) (a "verdict form [should be] considered as a whole and in the full context of the trial").

## C. Hodge Has Waived Any Argument that Section 1006 Requires the Defendant to Personally Make the False Entry

Hodge is similarly precluded from raising on appeal the argument that 18 U.S.C. § 1006, one of the FIRREA predicate statutes charged by the government, imposes liability only on an individual who personally makes a false entry in a document submitted to a HUD auditor, but not on a person who merely "causes" such a false entry to be made. (Br. 52-57). Although framed as a challenge to the sufficiency of the evidence, Hodge is in fact challenging the jury instructions the district court gave regarding section 1006. As Hodge himself requested these instructions, he is precluded from challenging them now.

Specifically, all parties, including Hodge, asked the district court to charge the jury that a defendant can be found liable under section 1006 if it "made, or caused to be made" a false entry. (ROA.5231). This was in fact the instruction given. (ROA.18634). Hodge did not object when the same language was included in the jury verdict questionnaire.

(ROA.18570). He also conceded that this was the appropriate standard in his post-trial motions. (ROA.8279, ROA.9010, ROA.9014, ROA.11166).

Under the invited-error doctrine, a party cannot raise on appeal a challenge to a jury instruction that the party itself requested. *McCaig*, 788 F.3d at 476; *Heck v. Triche*, 775 F.3d 265, 281 (5th Cir. 2014). Having not only failed to make the argument he now raises, but having explicitly urged upon the district court the standard that was used, Hodge cannot now complain that the district court erred. *See United States v. Lerma*, 877 F.3d 628, 632 (5th Cir. 2017).

Even if this Court were to review this jury instruction for plain error, however, *see* Fed. R. Civ. P. 51(d)(2), Hodge's challenge would still fail. To constitute plain error, the jury instructions would have to contravene clearly established Circuit law. *United States v. Fuchs*, 467 F.3d 889, 901 (5th Cir. 2006). Yet as Hodge himself admits, the jury instruction given was consistent with decades of Fifth Circuit precedent. (Br. 54-56 (citing *United States v. Mann*, 161 F.3d 840, 848 (5th Cir. 1998), and other cases)). There was thus no plain error. *Jimenez v. Wood County*, 660 F.3d 841, 847 (5th Cir. 2011) ("[A]ny error

in following decades of well-settled circuit precedent does not rise to the

level of obviousness.").[14]  As Hodge has not advanced any argument on

appeal that there is insufficient evidence to support the jury verdict

under the "cause to be made" standard, the jury verdict must stand.

## D. Hodge Has Waived Any Argument that Allied Capital's Annual Certifications Did Not Encompass Compliance with HUD's Quality Control Rules

Finally, Hodge cites the wrong version of the HUD regulations as

support for his meritless argument that HUD did not impose any

obligations on loan correspondents with respect to quality control.  (Br.

56-57).[15]  Again, this argument was not presented to the district court

---

[14] Although Hodge characterizes this Court's numerous rulings on this issue as unconsidered dicta (Br. 54-56), in fact this Court squarely applied the "cause to be made" standard in multiple cases. *E.g.*, *United States v. Schnitzer*, 145 F.3d 721, 729 (5th Cir. 1998) (government had "adequately proved that the defendants' concealment of Pettigrew's role in the sale . . . caused [the] accountants to record a profit that was false"); *United States v. Hopkins*, 916 F.2d 207, 216 (5th Cir. 1990) (upholding conviction of defendant who instructed subordinates to create false expense reports); *cf. United States v. Giles*, 300 U.S. 41, 48-49 (1937) (construing identical language in a related statute to apply even where the defendant has not personally made the false entry).

[15] Defendants' brief and appendix cite the post-2010 version of these regulations, which postdate the relevant timeframe and the elimination of independent loan correspondents. *See supra* at 50.  The relevant versions of the regulations are reproduced in an appendix to this brief.

(ROA.9013-15, ROA.11164-70, ROA.17798-99), and thus can be reviewed only for plain error.

But a review of the regulations that were in effect during the relevant period reveals no error, plain or otherwise. Those regulations required loan correspondents to conduct appropriate and timely quality control reviews of FHA loans in order to maintain their HUD-FHA approval. *See* 24 C.F.R. § 202.5(h) (1997) (regulation requires each "mortgagee" to "implement a [compliant] quality control plan"); *id.* § 202.2 (defining "mortgagee" to include "loan correspondent"); *see also id.* § 202.8(b) (listing specific requirements for loan correspondents that are in "addition to the general approval requirements" of section 202.5); (ROA.27945 (setting forth the requirements for a compliant quality control plan for loan correspondents); ROA.13022-23). Allied Capital's annual certifications were therefore false because the company did not substantially comply with FHA's quality control requirements. (ROA.17550-55, ROA.17539-42 (discussing 24 C.F.R. § 202.5(h)).[16]

---

[16] Indeed, Hodge admitted that he was well aware that Allied Capital was required to conduct quality control in accordance with HUD requirements. (ROA.17015; *see also* ROA.17007-08, ROA.17012).

## E. The District Court's Assessment of FIRREA Penalties Against Hodge Should Be Upheld

Hodge's challenge to the district court's imposition of civil penalties under FIRREA largely rests upon the same grounds as his challenge to the jury verdict. (Br. 59). Yet as the jury's verdict on this count must be sustained, the district court's imposition of a penalty for this violation was not in error.

Hodge's remaining arguments against the penalty assessment are equally flawed. The district court did not conflate the defendants (Br. 59-60), but imposed separate penalties against each of them under the FCA and FIRREA. (ROA.11594, ROA.11588 n.8). That the court discussed the egregiousness of the Allied companies' misconduct collectively is a function of the fact that they shared the same "chronic[ally] noncomplian[t]" quality control department (ROA.11591), which operated at Hodge's direction (ROA.13506, ROA.17017, ROA.15539, ROA.15675). Thus, the "clear evidence of bad faith" upon which the district court relied was equally attributable to each defendant. (ROA.11590).

Nor did the district court penalize Hodge for the actions of others. (Br. 61). The court cited evidence that the falsified quality control

audits and the wholesale failure to conduct any required quality control for almost a year were actions taken at Hodge's direction. (ROA.11591). It further cited Stell's testimony that Hodge instructed her to sign the corporate annual certifications, notwithstanding that he was aware at the time that the companies were out of compliance with HUD's quality control rules. (ROA.11591). The court therefore made explicit findings regarding Hodge's individual culpability and bad faith.

Finally, Hodge disingenuously argues that the district court erred in failing to consider his ability to pay (Br. 60), even though he made the strategic decision not to submit any information to the district court regarding his financial condition during the penalty phase, or to make any arguments regarding his ability to pay (ROA.8568-80).

## POINT III

### The District Court Did Not Err in Admitting Expert Testimony Based on Loan Sampling

### A.  Standard of Review

This Court reviews a district court's "determination of admissibility of expert evidence under *Daubert* for abuse of discretion." *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 850 (5th Cir. 2015) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)).

## B. Defendants Waived Any Challenge to the Use of Statistical Sampling or the Sampling Methodology Employed

After affirmatively advocating for statistical sampling as a means to reduce their discovery burden (ROA.3801), after assuring the government and the district court that they would not later attempt to argue that sampling was improper for the government's underwriting claims (ROA.11986-87), after agreeing that they had no issues with Ensor's methodology (ROA.12062-63), and after declining to make any *Daubert* challenge to her methodology when given the opportunity to do so by the district court at the outset of the case (ROA.3858-59), defendants now argue that the district court abdicated its gatekeeping function by denying their untimely *Daubert* motion arguing that statistical sampling in an underwriting case is inherently inappropriate (Br. 48-49, 68-71). Such sandbagging should not be countenanced. Any argument regarding the appropriateness of sampling or the sampling methodology used has thus been waived. *United States v. Olano*, 507 U.S. 725, 733 (1993); *United States v. Young*, 872 F.3d 742, 747 (5th Cir. 2017) (refusing to consider issue on appeal where defendant

affirmatively stated below that he "raise[d] no argument" as to that question).[17]

Even if this Court were to consider these arguments, they are entirely without merit. The record is clear that, far from abdicating its gatekeeping function, the district court gave extensive consideration to the sampling issue at the beginning of the discovery process and was intensely involved in the process by which the parties arrived at a statistical sampling methodology. *See supra* at 6-8. The court did not abuse its discretion in denying defendants' *Daubert* challenge, after it had expressly told them that such a challenge would not be entertained at that late date. (ROA.12067).

Defendants' reliance upon *Carlson v. Bioremedi Therapeutic Systems Inc.*, 822 F.3d 194 (5th Cir. 2016), is therefore misplaced. (Br. 64-65). *Bioremedi* stands for the unremarkable proposition that a

---

[17] Moreover, defendants now make additional arguments regarding admissibility that were not raised even in their belated *Daubert* motion. (Br. 68-69 (arguing that Payne had disregarded HUD guidelines regarding Total Scorecard, that Ensor should have controlled for "down-payment assistance programs," and that her sample was "skewed")). These new arguments have not been preserved for appeal. *Alfred v. Caterpillar, Inc.*, 262 F.3d 1083, 1087 (10th Cir. 2001) ("*Daubert* generally contemplates a 'gatekeeping' function, not a 'gotcha' junction.").

district court abuses its discretion where it does "not conduct[ ] a *Daubert* inquiry" or fails to make findings on the record. 822 F.3d at 201. This rule is not absolute, however, *see United States v. John*, 597 F.3d 263, 274-75 (5th Cir. 2010), and violations are evaluated under a harmless-error standard, *Mathis v. Exxon Corp.*, 302 F.3d 448, 460 (5th Cir. 2002); *Smith v. Jenkins*, 732 F.3d 51, 69 (1st Cir. 2013). The district court conducted a full *Daubert* inquiry in this case, which included briefing and oral argument. (ROA.30252-31278, ROA.4520-628, ROA.4723-74, ROA.12424-591). But defendants' challenge to the admissibility of the experts' testimony rested almost entirely on their untimely challenge to sampling. (ROA.30268-74, ROA.30279-81).[18] Nothing in *Bioremedi* requires a district court to make findings on issues that have been waived, particularly where its reasoning has been expressly set forth during numerous prior conferences and hearings.

In any event, the district court did "restate" in detail its reasoning for admitting testimony that relied upon statistical sampling when it

---

[18] Defendants originally challenged the admissibility of the testimony of the government's damages expert on additional unrelated grounds, but withdrew most of those challenges during the *Daubert* hearing. (ROA.12469-72).

denied defendants' motion for a new trial.  (ROA.11575-76).  In doing so, the district court cited the ample case law establishing that sampling and extrapolation are relevant and reliable methodologies. (ROA.11575-76).  Defendants' characterization of these statements as a "post-hoc rationalization" (Br. 64) ignores the many months prior to trial that the court devoted specifically to the sampling issue.

Even if the Court were to reach the issue, the district court did not abuse its discretion in determining that Ensor and Payne's expert testimony was reliable.  Sampling and extrapolation have been repeatedly recognized as permissible means of proving liability and damages in complex FCA cases, where a claim-by-claim review is not feasible.  *See, e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1046 (2016); *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 512 (S.D.N.Y. 2013) (allowing sampling in case where each loan file was potentially unique); *In re Countrywide Financial Corp. MBS Litig.*, 984 F. Supp. 2d 1021, 1032 (C.D. Cal. 2013) (same); *cf. In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1020 (5th Cir. 1997) ("The applicability of inferential statistics ha[s] long been recognized by the courts.").

Defendants' reliance (Br. 48-49) on a single unpublished district court case that "disagrees" with the weight of authority on this issue, *United States ex rel. Wall v. Vista Hospice Care*, No. 3:07-cv-0604, 2016 WL 3449833, at *13 (N.D. Tex. June 20, 2016), hardly demonstrates that the district court's decision to admit this testimony was "manifestly erroneous," *Bioremedi*, 822 F.3d at 199. In any event, to the extent that defendants argue that statistical sampling is *per se* inappropriate in cases involving individualized or subjective judgment (a proposition that finds no support in the record from any expert in statistics), Payne's analysis was focused on objective rule violations, not gray areas where the guidelines permit underwriters to use their best judgment, so this principle, even if true, is irrelevant to this case.

Defendants' challenge to the sampling methodology used in this case is similarly misplaced.  They argue that Ensor should have controlled for factors that might bear on why a loan eventually went into default, such as the financial crisis.  (Br. 69-70).  But the sample was neither structured nor used to establish a causal link between defaults and underwriting.  (ROA.15453-56).  It was designed for the sole purpose of examining the extent to which Allied Corporation's

underwriters complied with FHA guidelines at the time they underwrote the loans. (ROA.15453-56). Controlling for a *post hoc* event such as the date of default would thus not have increased the precision of the sample.[19]

## POINT IV

### The District Court Did Not Err in Excusing a Juror Who Refused to Deliberate and Threatened Other Jurors

Finally, the district court did not abuse its discretion in excusing Juror #7. The record clearly shows that this juror refused to deliberate, threatened another juror, and failed to testify truthfully in response to the district court's questions—all grounds to excuse him.

### A. Standard of Review

"During trial or deliberation, the court may excuse a juror for good cause." Fed. R. Civ. P. 47(c). This decision is within the district court's discretion, and will not be disturbed absent prejudice to the defendant. *United States v. Ebron*, 683 F.3d 105, 126 (5th Cir. 2012). "[P]rejudice will be found only 'if the juror was discharged without factual support

---

[19] Defendants' challenge to Payne's methodology (Br. 67-68), is discussed *supra* at 58-59.

or for a legally irrelevant reason.'" *Id.* (quoting *United States v. Virgen-Moreno*, 265 F.3d 276, 288 (5th Cir. 2001)).

## B. The District Court Did Not Abuse Its Discretion in Excusing Juror #7

This Court has routinely upheld juror dismissals in scenarios involving failure to deliberate or follow instructions, verbal abuse, or dishonesty. *See United States v. Patel*, 485 F. App'x 702, 712-13 (5th Cir. 2012) (juror "had engaged in verbal abuse," had "already made up her mind, from the beginning," was reading a book, and refused to speak to the other jurors); *United States v. Nnaji*, 70 F. App'x 217, 218 (5th Cir. 2003) (refusal to deliberate and review evidence); *Ebron*, 683 F.3d at 128 (lack of candor and failure to follow instructions); *United States v. Aguilar*, 242 F. App'x 239, 248 (5th Cir. 2007) (failure to follow instructions); *United States v. Edwards*, 303 F.3d 606, 631-32 (5th Cir. 2002) (lack of candor and failure to follow instructions). All of those circumstances were present here.

The testimony of the jurors, found credible by the district court, clearly demonstrates that Juror #7 refused to participate in deliberations or review the evidence, wore earplugs and dark glasses in the jury room, slept during deliberations, and became "irate" and

"yelled" when the other jurors asked him to review the evidence. (ROA.18836-37, ROA.18865-66, ROA.18882-83). The district court thus acted well within its discretion to excuse him for failing to deliberate in violation of its instructions. *See Ebron*, 683 F.3d at 127.

Juror #7 also acted in a threatening manner toward at least one other juror—a second, independent, ground for excusing him. *See Patel*, 485 F. App'x at 712; *see also United States v. Carson*, 455 F.3d 336, 352 (D.C. Cir. 2006). Several jurors reported that Juror #7's behavior was threatening. One went so far as to say that his yelling made her "shaky." (ROA.18866). Others reported feeling threatened, or that the juror was acting "scary." (ROA.18878).

Based on its observation of the jurors' demeanors, the district court also found that Juror #7 failed to testify truthfully (ROA.18899), yet another ground for excusing him, *Ebron*, 683 F.3d at 127. This Court should defer to that finding. *See id.* at 126.

Defendants respond by wrongly urging the Court to apply the so-called "no possibility" rule, which provides that once deliberations commence, a juror may be excused for misconduct that would prompt inquiry into the juror's thought process only if there is "no possibility"

that the juror's problem stems from his or her view of the evidence. (Br. 72-73). That standard is inapplicable here. As an initial matter, this Court has not adopted the "no possibility" rule. *See, e.g.*, *Ebron*, 683 F.3d at 127; *Patel*, 485 F. App'x at 713. Even if it had, that rule would apply only if the district court's inquiry required evaluation of the reasons underlying the juror's views of the case. *See Edwards*, 303 F.3d at 633; *see also Ebron*, 683 F.3d at 127. No such inquiry was conducted here. (ROA.18898-99).

Finally, defendants wrongly contend that the district court's questioning locked the jurors into their decisions. (Br. 74). To the contrary, the eight remaining jurors each testified that they were willing to re-examine their views and to reconsider their positions. (ROA.18852, ROA.18855, ROA.18857, ROA.18862, ROA.18864, ROA.18869, ROA.18877, ROA.18880). In addition, after Juror #7 was excused, the jurors continued to deliberate for nearly a full day before reaching a verdict.

For the foregoing reasons, the district court did not abuse its discretion in excusing Juror #7.

**CONCLUSION**

The judgment of the district court should be affirmed.

Respectfully submitted,

RYAN K. PATRICK
United States Attorney for the
Southern District of Texas

By:    *s/ Jean-David Barnea*
Jean-David Barnea
Jeannette A. Vargas
Joseph N. Cordaro
Benjamin H. Torrance
Special Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2679
Fax: (212) 637-2686
Email: jean-david.barnea@usdoj.gov

ATTORNEYS FOR APPELLEE

## Certificate of Service

I, Jean-David Barnea, Special Assistant United States Attorney, hereby certify that on June 18, 2018, an electronic copy of the Brief for Plaintiff-Appellee was served by notice of electronic filing via this Court's ECF system on opposing counsel, David M. Gunn, Robert David "B.D." Daniel, David A. Warrington, and Laurin H. Mills.

Upon notification that the electronically filed brief has been accepted as sufficient, and upon the Clerk's request, seven paper copies of this brief will be submitted to the Clerk.  *See* 5th Cir. R. 25.2.1; 5th Cir. R. 31.1; 5th Cir. ECF filing standard E(1).

 *s/ Jean-David Barnea*
Jean-David Barnea
Special Assistant United States Attorney

# Certificate of Compliance

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as extended by this Court's order dated April 6, 2018, because it contains 16,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Century Schoolbook, 14 point font for text and 14 point font for footnotes.

3.  This brief complies with the privacy redaction requirement of 5th Cir. R. 25.2.13 because it has been redacted of any personal data identifiers.

4.  This brief complies with the electronic submission of 5th Cir. R. 25.2.1, because it is an exact copy of the paper document.

5.  This brief is free of viruses because it has been scanned for viruses with the most recent version of McAfee Endpoint Security scanning program.

_s/ Jean-David Barnea_
Jean-David Barnea
Special Assistant United States Attorney

# Appendix

24 C.F.R. § 202.2 (1997)
24 C.F.R. § 202.5 (1997)
24 C.F.R. § 202.8 (1997)

Code of Federal Regulations
   Title 24. Housing and Urban Development
      Subtitle B. Regulations Relating to Housing and Urban Development
         Chapter II. Office of Assistant Secretary for Housing--Federal Housing Commissioner, Department of Housing and Urban Development (Refs & Annos)
            Subchapter B. Mortgage and Loan Insurance Programs Under National Housing Act and Other Authorities
               Part 202. Approval of Lending Institutions and Mortgagees (Refs & Annos)
               Subpart A. General Requirements

This section has been updated. Click here for the updated version.

24 C.F.R. § 202.2

§ 202.2 Definitions.

Effective: [See Text Amendments] to May 19, 2010

Act means the National Housing Act (12 U.S.C. 1702 et seq.)

Claim means a single family insured mortgage for which the Secretary pays an insurance claim within 24 months after the mortgage is insured.

Default means a single family insured mortgage in default for 90 or more days within 24 months after the mortgage is insured.

<Text of definition effective until May 20, 2010.>

Lender or Title I lender means a financial institution that:

(a) Holds a valid Title I Contract of Insurance and is approved by the Secretary under this part as a supervised lender under § 202.6, a nonsupervised lender under § 202.7, an investing lender under § 202.9 or a governmental or similar institution under § 202.10;

(b) Is under suspension or held a Title I contract that has been terminated but remains responsible for servicing or selling Title I loans that it holds and is authorized to file insurance claims on such loans; or

(c) Is a loan correspondent approved for Title I programs only under § 202.8.

<Text of definition effective May 20, 2010.>

Lender or Title I lender means a financial institution that:

(a) Holds a valid Title I Contract of Insurance and is approved by the Secretary under this part as a supervised lender under § 202.6, a nonsupervised lender under § 202.7, an investing lender under § 202.9, or a governmental or similar institution under § 202.10; or

(b) Is under suspension or held a Title I contract that has been terminated but remains responsible for servicing or selling Title I loans that it holds and is authorized to file insurance claims on such loans.

Loan or Title I loan means a loan authorized for insurance under Title I of the Act.

Mortgage, Title II mortgage or insured mortgage means a mortgage or loan insured under Title II or Title XI of the Act.

<Text of definition effective until May 20, 2010.>

Mortgagee or Title II mortgagee means a mortgage lender which is approved to participate in the Title II programs as a supervised mortgagee under § 202.6, a nonsupervised mortgagee under § 202.7, a loan correspondent under § 202.8, an investing mortgagee under § 202.9 or a governmental or similar institution under § 202.10.

<Text of definition effective May 20, 2010.>

Mortgagee or Title II mortgagee means a mortgage lender that is approved to participate in the Title II programs as a supervised mortgagee under § 202.6, a nonsupervised mortgagee under § 202.7, an investing mortgagee under § 202.9, or a governmental or similar institution under 202.10.

Multifamily mortgage means a mortgagee approved to participate only in multifamily Title II programs, except that for purposes of § 202.8(b)(1) the term also means a mortgagee approved to participate in both single family and multifamily Title II programs.

Normal rate means the rate of defaults and claims on insured mortgages for the geographic area served by a HUD field office, or other area designated by the Secretary, in which a mortgagee originates mortgages.

Origination approval agreement means the Secretary's agreement that a mortgagee is approved to originate single family insured mortgages.

Title I program(s) means an insurance program or programs authorized by Title I of the Act.

Title II program(s) means an insurance program or programs authorized by Title II or Title XI of the Act.

**Credits**
[62 FR 65181, Dec. 10, 1997; 63 FR 44361, Aug. 18, 1998; 75 FR 20731, April 20, 2010]

SOURCE: 62 FR 20082, April 24, 1997, unless otherwise noted.

AUTHORITY: 12 U.S.C. 1703, 1709 and 1715b; 42 U.S.C. 3535(d).

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 24. Housing and Urban Development
    Subtitle B. Regulations Relating to Housing and Urban Development
      Chapter II. Office of Assistant Secretary for Housing--Federal Housing Commissioner, Department of Housing and Urban Development (Refs & Annos)
        Subchapter B. Mortgage and Loan Insurance Programs Under National Housing Act and Other Authorities
          Part 202. Approval of Lending Institutions and Mortgagees (Refs & Annos)
            Subpart A. General Requirements

This section has been updated. Click here for the updated version.

24 C.F.R. § 202.5

§ 202.5 General approval standards.

Effective: [See Text Amendments] to January 27, 2008

To be approved for participation in the Title I or Title II programs, and to maintain approval, a lender or mortgagee shall meet and continue to meet the general requirements of paragraphs (a)–(n) of this § 202.5 (except as provided in § 202.10(b)) and the requirements for one of the eligible classes of lenders or mortgagees in §§ 202.6 through 202.10.

(a) Business form. The lender or mortgagee shall be a corporation or other chartered institution, a permanent organization having succession or a partnership. A partnership must meet the requirements of paragraphs (a)(1) through (4) of this section.

(1) Each general partner must be a corporation or other chartered institution consisting of two or more persons.

(2) One general partner must be designated as the managing general partner. The managing general partner shall comply with the requirements of paragraphs (b), (c) and (f) of this section. The managing general partner must have as its principal activity the management of one or more partnerships, all of which are mortgage lenders or property improvement or manufactured home lenders, and must have exclusive authority to deal directly with the Secretary on behalf of each partnership. Newly admitted partners must agree to the management of the partnership by the designated managing general partner. If the managing general partner withdraws or is removed from the partnership for any reason, a new managing general partner shall be substituted, and the Secretary shall be immediately notified of the substitution.

(3) The partnership agreement shall specify that the partnership shall exist for the minimum term of years required by the Secretary. All insured mortgages and Title I loans held by the partnership shall be transferred to a lender or mortgagee approved under this part prior to the termination of the partnership. The partnership shall be specifically authorized to continue its existence if a partner withdraws.

(4) The Secretary must be notified immediately of any amendments to the partnership agreement which would affect the partnership's actions under the Title I or Title II programs.

(b) Employees. The lender or mortgagee shall employ competent personnel trained to perform their assigned responsibilities in consumer or mortgage lending, including origination, servicing and collection activities, and shall maintain adequate staff and facilities to originate and service mortgages or Title I loans, in accordance with applicable regulations, to the extent the mortgagee or lender engages in such activities.

(c) Officers. All employees who will sign applications for mortgage insurance on behalf of the mortgagee or report loans for insurance shall be corporate officers or shall otherwise be authorized to bind the lender or mortgagee in the origination transaction. The lender or mortgagee shall ensure that an authorized person reports all originations, purchases, and sales of Title I loans or Title II mortgages to the Secretary for the purpose of obtaining or transferring insurance coverage.

(d) Escrows. The lender or mortgagee shall not use escrow funds for any purpose other than that for which they were received. It shall segregate escrow commitment deposits, work completion deposits, and all periodic payments received under loans or insured mortgages on account of ground rents, taxes, assessments, and insurance charges or premiums, and shall deposit such funds with one or more financial institutions in a special account or accounts that are fully insured by the Federal Deposit Insurance Corporation or the National Credit Union Administration, except as otherwise provided in writing by the Secretary.

(e) Servicing. A lender shall service or arrange for servicing of the loan in accordance with the requirements of part 201 of this chapter. A mortgagee shall service or arrange for servicing of the mortgage in accordance with the servicing responsibilities contained in subpart C of part 203 and in part 207 of this chapter, with all other applicable regulations contained in this title, and with such additional conditions and requirements as the Secretary may impose.

(f) Business changes. The lender or mortgagee shall provide prompt notification to the Secretary of all changes in its legal structure, including, but not limited to, mergers, terminations, name, location, control of ownership, and character of business.

(g) Financial statements. The lender or mortgagee shall, upon request by the Secretary, furnish a copy of its latest financial statement, furnish such other information as the Secretary may request, and submit to an examination of that portion of its records which relates to its Title I and/or Title II program activities.

(h) Quality control plan. The lender or mortgagee shall implement a written quality control plan, acceptable to the Secretary, that assures compliance with the regulations and other issuances of the Secretary regarding loan or mortgage origination and servicing.

(i) Fees. The lender or mortgagee, unless approved under § 202.10, shall pay an application fee and annual fees, including additional fees for each branch office authorized to originate Title I loans or submit applications for mortgage insurance, at such times and in such amounts as the Secretary may require. The Secretary may identify additional classes or groups of lenders or mortgagees that may be exempt from one or more of these fees.

(j) Ineligibility. Neither the lender or mortgagee, nor any officer, partner, director, principal or employee of the lender or mortgagee shall:

<Text of subsection (j)(1) effective until Jan. 28, 2008.>

(1) Be suspended, debarred or otherwise restricted under part 24 or part 25 of this title, or under similar procedures of any other Federal agency;

<Text of subsection (j)(1) effective Jan. 28, 2008.>

(1) Be suspended, debarred, or otherwise restricted under 2 CFR part 2424 or part 25 of this title, or under similar procedures of any other federal agency;

(2) Be indicted for, or have been convicted of, an offense which reflects upon the responsibility, integrity or ability of the lender or mortgagee to participate in the Title I or Title II programs;

(3) Be subject to unresolved findings as a result of HUD or other governmental audits or investigations; or

(4) Be engaged in business practices that do not conform to generally accepted practices of prudent mortgagees or that demonstrate irresponsibility.

(k) Branch offices. A lender may, upon approval by the Secretary, maintain branch offices for the origination of Title I loans. A branch office of a mortgagee must be registered with the Department in order to originate mortgages or submit applications for mortgage insurance. The lender or mortgagee shall remain fully responsible to the Secretary for the actions of its branch offices.

(l) Conflict of interest. A mortgagee may not pay anything of value, directly or indirectly, in connection with any insured mortgage transaction or transactions to any person or entity if such person or entity has received any other consideration from the mortgagor, seller, builder, or any other person for services related to such transactions or related to the purchase or sale of the mortgaged property, except that consideration approved by the Secretary may be paid for services actually performed. The mortgagee shall not pay a referral fee to any person or organization.

(m) Reports. Each lender and mortgagee must submit a yearly verification report on a form prescribed by the Secretary. Upon application for approval and with each annual recertification, each lender and mortgagee must submit a certification that it has not been refused a license and has not been sanctioned by any State or States in which it will originate insured mortgages or Title I loans. In addition, each mortgagee shall file the following:

(1) An audited or unaudited financial statement, within 30 days of the end of each fiscal quarter in which the mortgagee experiences an operating loss of 20 percent of its net worth, and until the mortgagee demonstrates an operating profit for two consecutive quarters or until the next recertification, whichever is the longer period; and

(2) A statement of net worth within 30 days of the commencement of voluntary or involuntary bankruptcy, conservatorship, receivership or any transfer of control to a Federal or State supervisory agency.

(n) Net worth.

(1) Each supervised or nonsupervised lender or mortgagee approved under §§ 202.6 and 202.7 shall have a net worth of not less than $250,000 in assets acceptable to the Secretary. Each Title II supervised or nonsupervised mortgagee, except a multifamily mortgagee, shall have additional net worth in excess of $250,000 of not less than one percent of the mortgage volume exceeding $25,000,000 in value, but total net worth is not required to exceed $1,000,000. Mortgage volume is calculated as of the end of the fiscal year being audited and equals the sum of:

(i) The aggregate original amount of insured mortgages that the mortgagee originated and that were insured during the fiscal year, or that the mortgagee purchased as a sponsor from its loan correspondent(s) during the fiscal year; and

(ii) The aggregate principal amount, as of the end of the fiscal year, of all mortgages that are serviced by the mortgagee at the end of the fiscal year but were not counted as mortgages originated by the mortgagee or purchased from its loan correspondent(s).

(2) Net worth requirements for loan correspondent lenders or mortgagees approved under § 202.8 are described in that section.

**Credits**
[62 FR 65181, Dec. 10, 1997; 63 FR 9742, Feb. 26, 1998; 63 FR 44361, Aug. 18, 1998; 67 FR 53451, Aug. 15, 2002; 72 FR 73495, Dec. 27, 2007]

SOURCE: 62 FR 20082, April 24, 1997, unless otherwise noted.

AUTHORITY: 12 U.S.C. 1703, 1709 and 1715b; 42 U.S.C. 3535(d).

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

> Code of Federal Regulations
>> Title 24. Housing and Urban Development
>>> Subtitle B. Regulations Relating to Housing and Urban Development
>>>> Chapter II. Office of Assistant Secretary for Housing--Federal Housing Commissioner, Department of Housing and Urban Development (Refs & Annos)
>>>>> Subchapter B. Mortgage and Loan Insurance Programs Under National Housing Act and Other Authorities
>>>>>> Part 202. Approval of Lending Institutions and Mortgagees (Refs & Annos)
>>>>>>> Subpart B. Classes of Lenders and Mortgagees

This section has been updated. Click here for the updated version.

24 C.F.R. § 202.8

§ 202.8 Loan correspondent lenders and mortgagees.

Effective: [See Text Amendments] to May 19, 2010

<Text of section effective until May 20, 2010.>

(a) Definitions--

Loan correspondent. (1) A loan correspondent lender does not hold a Title I Contract of Insurance and may not purchase or hold loans but may be approved to originate Title I direct loans for sale or transfer to a sponsor or sponsors which holds a valid Title I Contract of Insurance and is not under suspension.

(2) A loan correspondent mortgagee is a mortgagee that has as its principal activity the origination of mortgages for sale or transfer to its sponsor or sponsors or that meets the definition of a supervised mortgagee in § 202.6(a) but applies for approval as a loan correspondent mortgagee. A loan correspondent mortgagee may originate mortgages and submit applications for mortgage insurance but it may not hold, purchase or service insured mortgages, except that a loan correspondent mortgagee meeting the definition of a supervised mortgagee in § 202.6(a) may service insured mortgages in its own portfolio.

Sponsor. (1) With respect to Title I programs, a sponsor is a lender that holds a valid Title I Contract of Insurance and meets the net worth requirement for the class of lender to which it belongs.

(2) With respect to Title II programs, a sponsor is a mortgagee which holds a valid origination approval agreement, is approved to participate in the Direct Endorsement program, and meets the net worth requirement for the class of mortgagee to which it belongs.

(b) Additional requirements. In addition to the general approval requirements in § 202.5, a loan correspondent lender or mortgagee shall meet the following requirements:

(1) Net worth. A loan correspondent lender or mortgagee shall have a net worth of not less than $63,000 in assets acceptable to the Secretary, plus an additional $25,000 for each branch office authorized by the Secretary, up to

a maximum requirement of $250,000, except that a multifamily mortgagee shall have a net worth of not less than $250,000 in assets acceptable to the Secretary.

(2) Notification. A loan correspondent lender or mortgagee and each of its sponsors shall provide prompt notification to the Secretary if their loan correspondent agreement is terminated.

(3) Audit report. A loan correspondent lender or mortgagee must comply with the financial reporting requirements in 24 CFR part 5, subpart H except that a loan correspondent mortgagee meeting the definition of a supervised lender or mortgagee in § 202.6(a) need not file annual audit reports. Audit reports shall be based on audits performed by a certified public accountant, or by an independent public accountant licensed by a regulatory authority of a State or other political subdivision of the United States on or before December 31, 1970, and shall include:

(i) A financial statement in a form acceptable to the Secretary, including a balance sheet, statement of operations and retained earnings, a statement of cash flows, an analysis of the net worth adjusted to reflect only assets acceptable to the Secretary and an analysis of escrow funds; and

(ii) Such other financial information as the Secretary may require to determine the accuracy and validity of the audit report.

(4) Liquid assets. A loan correspondent mortgagee shall maintain liquid assets consisting of cash or its equivalent acceptable to the Secretary in the amount of 20 percent of its net worth, up to a maximum liquidity requirement of $100,000.

(5) A loan correspondent lender or mortgagee may sell or transfer loans or mortgages only to its sponsors, although a loan correspondent mortgagee may sell to a mortgagee that is not a sponsor with the Secretary's approval. There is no limitation on the number of sponsors that a loan correspondent lender or mortgagee may have and no limitation on the number of loan correspondents that a lender or mortgagee may sponsor.

(6) Each sponsor must obtain approval of its loan correspondent lenders or mortgagees from the Secretary.

(7) Each sponsor shall be responsible to the Secretary for the actions of its loan correspondent lenders or mortgagees in originating loans or mortgages, unless applicable law or regulation requires specific knowledge on the part of the party to be held responsible. If specific knowledge is required, the Secretary will presume that a sponsor has knowledge of the actions of its loan correspondent lenders or mortgagees in originating loans or mortgages and the sponsor is responsible for those actions unless it can rebut the presumption with affirmative evidence.

(8) A loan correspondent mortgagee shall comply with the warehouse line of credit requirements of § 202.7(b)(3) (ii), unless there is a written agreement by its sponsor to fund all mortgages originated by the loan correspondent mortgagee.

(9) For mortgages processed through Direct Endorsement under §§ 203.5 and 203.255(b) of this chapter, or through Lender Insurance under §§ 203.6 and 203.255(f) of this chapter, underwriting shall be the responsibility of the Direct

Endorsement sponsor or Lender Insurance sponsor (respectively), and the mortgage shall be closed in the loan correspondent mortgagee's own name or the name of the sponsor that will purchase the loan. For mortgages not processed through Direct Endorsement or through Lender Insurance, the mortgage must be both underwritten and closed in the loan correspondent's own name.

(10) A loan correspondent lender shall close all loans in its own name prior to sale or transfer of the loans to its sponsor.

**Credits**
[62 FR 30225, June 2, 1997; 66 FR 56420, Nov. 7, 2001; 67 FR 53451, Aug. 15, 2002]

SOURCE: 62 FR 20082, April 24, 1997, unless otherwise noted.

AUTHORITY: 12 U.S.C. 1703, 1709 and 1715b; 42 U.S.C. 3535(d).

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.